**Opinion issued August 26, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-01045-CR

———————————

## EX PARTE RICHARD MARK BOWMAN, Appellant

---

**On Appeal from the County Criminal Court at Law No. 2**
**Harris County, Texas**
**Trial Court Case No. 1921607**

---

## OPINION ON REHEARING

Appellee, the State of Texas, has filed a motion for rehearing and a motion

for rehearing en banc of our June 5, 2014 opinion and judgment. We deny the

motion for rehearing, withdraw our opinion and judgment of June 5, 2014, and issue the following opinion and a new judgment in their stead.[1]

Appellant, Richard Mark Bowman, challenges the trial court's order denying his application for a writ of habeas corpus.[2] In his sole issue, appellant contends that the trial court erred in denying him relief from a judgment of conviction of the misdemeanor offense of driving while intoxicated ("DWI")[3] on the ground that his trial counsel was ineffective. We reverse the order of the trial court.[4]

---

[1] Because we have made changes to the opinion, the State's motion for rehearing en banc is dismissed as moot. *See Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 33 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (holding motion for en banc reconsideration moot when panel issues new opinion and judgment).

[2] *See* TEX. CODE CRIM. PROC. ANN. art. 11.072, § 8 (Vernon Supp. 2013) (providing for appeal in misdemeanor case in which applicant seeks relief from judgment of conviction ordering community supervision), art. 11.09 (Vernon 2005) (providing person confined on misdemeanor charge may apply for writ of habeas corpus). A person who is subject to "collateral consequences" resulting from a conviction is considered confined. *See State v. Collazo*, 264 S.W.3d 121, 126–27 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *see also Tarvin v. State*, 01-08-00449-CR, 2011 WL 3820705, at *3 (Tex. App.—Houston [1st Dist.] Aug. 25, 2011, no pet.) (mem. op, not designated for publication) (concluding defendant invoked trial court's habeas jurisdiction when prior misdemeanor conviction used to enhance subsequent misdemeanor offense to third-degree felony offense).

[3] *See* TEX. PENAL CODE ANN. § 49.04 (Vernon Supp. 2013).

[4] We note that an appeal from the denial of an application for a writ of a habeas corpus proceeds on an accelerated basis and is to be "heard at the earliest practicable time." TEX. R. APP. P. 31.1, 31.2. Here, the appellate record was timely filed, and the Court ordered that appellant's brief be filed by January 6, 2014, and the State's brief twenty days thereafter. The Court set the case for submission with oral argument to be heard on March 5, 2014.

Appellant filed his brief on December 31, 2013, and, thus, the State's brief was due by January 20, 2014. The State failed to timely file its brief as ordered. And, although the Court, on February 5, 2014, sent a notice to the State that it still had

## Background

At appellant's trial in 2005, Houston Police Department ("HPD") Officer W. Lindsey, Jr., who was assigned to the HPD DWI Task Force, testified that he arrested appellant at approximately 1:00 a.m. on September 24, 2004 for DWI. He initially stopped appellant for driving approximately sixty miles per hour in a thirty-five-mile-per-hour zone on Westheimer Road. According to Lindsey, appellant's vehicle was not weaving and, other than speeding, his driving was legal. When Lindsey first approached appellant, Lindsey noted that appellant had a dazed look and a strong odor of alcohol on his breath.

Officer Lindsey explained that because appellant initially refused to perform standard field sobriety tests, he handcuffed appellant and told him that he was under arrest. Appellant then agreed to perform the tests, and Lindsey removed the handcuffs. In answering Lindsey's questions before he administered the tests, appellant stated that he had a bad knee and ankle, had broken them in a jet-skiing accident, and took only aspirin for the pain. When asked if he participated in outdoor activities, appellant answered that he did. Lindsey then administered horizontal-gaze-nystagmus ("HGN") and walk-and-turn tests, and he noted "clues"

not filed its brief, the State again failed to file a brief. Rather, on March 4, 2014, the day before oral argument was set to be heard, the State filed a motion to reschedule oral argument, which the Court granted in the interest of justice. The State also filed a motion to extend time to file its brief, which the Court, over appellant's objection, granted in the interest of justice. The Court filed the State's late brief after hearing oral argument.

3

on each test indicating that appellant was intoxicated. Lindsey also administered a one-leg-stand test, but soon after starting, appellant stated that he could not perform the test. In Lindsey's opinion, appellant could not perform the test because he was intoxicated. Based on his training and experience, his observations that night, and the totality of the field sobriety tests, Lindsey opined that appellant was intoxicated, had lost the normal use of his physical and mental faculties from the use of alcohol, and posed a danger to himself and others. The entire traffic stop, including the field sobriety tests, was recorded on the camera in Lindsey's patrol car.

On cross-examination, Officer Lindsey testified that a knee or ankle injury could possibly invalidate the one-leg-stand and walk-and-turn tests. Appellant's trial counsel also elicited testimony from Lindsey about his overtime pay and DWI arrest record. Lindsey explained that he was not on duty while testifying at appellant's trial, but was being paid "overtime, time and a half" and received overtime pay whenever he made an arrest and went to court. He noted that he "solely" made DWI arrests, and he had made 476 arrests during the previous year.

HPD Officers R. Cibulski and C. Green, also assigned to the HPD DWI Task Force, testified at appellant's trial that they observed appellant after he had been transported to a police station after his arrest. Cibulski testified that appellant refused to give him a breath sample or sign the statutory warning form, but

4

appellant did ask to give a blood sample. When talking with appellant, Cibulski noted that appellant had a strong odor of alcohol on his breath, red bloodshot eyes, and slurred speech. Cibulski, however, did not form an opinion as to whether appellant was intoxicated. Green testified that appellant refused to perform standard field sobriety tests on video at the station, but appellant did not say that he was unable to perform the tests. According to Green, appellant did not look injured, nor did he limp, when he came into the station, and he did not complain of an injury. Green also noted a strong odor of alcohol on appellant's breath and that he had glassy eyes. However, Green did not form an opinion as to whether appellant was intoxicated because he had refused to perform the field sobriety tests. The court admitted into evidence the HPD video recording of the traffic stop and appellant at the police station.

Stephanie Burke, appellant's friend, testified at appellant's trial that he had been at her house from about 10:00 p.m. to 12:45 a.m. on the night that he was arrested. She had given appellant a glass of wine, but she did not know how much he drank or how much he had had to drink earlier in the day. During their time together, they talked and watched a movie, and appellant fell asleep. Burke explained that appellant, who had told her that he had been jet skiing, either all day or all afternoon, appeared to be acting normally when he left her house.

5

The jury found appellant guilty, and the trial court assessed his punishment at confinement for 180 days, suspended the sentence, placed him on community supervision for one year, and assessed a fine of $800.

In April 2013, appellant again was charged by information with driving while intoxicated, and the State alleged the 2005 conviction as a jurisdictional enhancement. Appellant then filed his application for a writ of habeas corpus, seeking relief from the 2005 judgment of conviction and arguing that his trial counsel was ineffective because he failed to (1) impeach Officer Lindsey with the amount of his overtime pay for testifying at DWI trials and argue that he was motivated to make DWI arrests for financial gain, (2) offer evidence that physical dexterity is not required to jet ski, and (3) offer medical records to prove appellant's ankle injury. In regard to trial counsel's failure to impeach Lindsey with the amount of his overtime pay for testifying in DWI trials, appellant complained that:

> Competent defense lawyers would obtain [Lindsey's] HPD payroll records pursuant to the Public Information Act before they tried DWI cases in which he was going to testify and would impeach him with the amount of overtime pay he received to demonstrate his financial motive for making DWI arrests. They typically would argue that he arrested sober drivers for DWI because he knew that they would go to trial, so he would receive overtime pay for appearing in court to testify; that, for this reason, he gave no driver the benefit of the doubt at the scene; that, in effect, he received three days of pay for appearing at a two-day trial; that he received the money even if the defendant were acquitted; and that his overtime pay exceeded his regular pay during his tenure on the DWI Task Force. Arguments of

6

this nature frequently persuaded juries to reject Lindsey's opinion regarding intoxication.

The trial court held a hearing on the application, and appellant's trial counsel testified. Appellant also offered, and the trial court admitted without objection, a portion of the trial record; the HPD video made the night of appellant's arrest; affidavits of three criminal defense attorneys regarding impeachment of Officer Lindsey's testimony with his overtime pay records; the trial judge's affidavit, indicating that he would have allowed Lindsey to answer questions posed about the amount of his overtime pay; documents reflecting Lindsey's 1990 suspension from HPD, his pay between 1992 and 2004, and his ultimate resignation from HPD; a Houston Chronicle article detailing the abuse of overtime pay by HPD DWI Task Force officers and Lindsey's HPD disciplinary violations; appellant's affidavit about his injury and the physical dexterity required for jet skiing; his medical records related to the ankle injury; and a picture of a seated person riding a jet ski.

The trial court signed findings of fact and conclusions of law. It found that in the 2005 trial:

> Defense counsel . . . argued that [appellant's] driving was legal except for speeding; that Lindsey arrested him based on probable cause to believe that he was intoxicated rather than on proof beyond a reasonable doubt; that Cibulski and Green did not conclude that he was intoxicated; and that he told Lindsey that he could not perform the field sobriety tests because he had a bad knee and ankle which, according to a law enforcement manual, would invalidate the tests. [Defense counsel] did not argue that Lindsey lacked credibility or had an improper motive to arrest [appellant].

7

The prosecutor countered that a leg injury could not affect the HGN test, which [appellant] failed; that [appellant] failed the walk and turn test; that [appellant] would rather lose his driver's license for six months than have the jury learn the result of a breath test; that his leg injury could not be that bad if he had been jet skiing all day; and that he did not bring medical records to corroborate an injury.

The trial court also specifically found that "[defense counsel] did not have Lindsey's HPD payroll or disciplinary records at the time of [appellant's] trial." However, the court concluded that trial counsel's "representation was well within the wide range of reasonable professional assistance" and appellant "cannot show that but for the alleged failings of the defense counsel, the result would have been different." Thus, the trial court denied appellant habeas relief.

### Standard of Review

An applicant seeking post-conviction habeas corpus relief must prove his claims by a preponderance of the evidence. *Ex parte Richardson*, 70 S.W.3d 865, 870 (Tex. Crim. App. 2002). In reviewing a trial court's decision to deny habeas relief, we view the facts in the light most favorable to the trial court's ruling. *Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003), *overruled in part on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007). We afford almost total deference to the habeas court's findings of fact that are supported by the record, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Ex parte Amezquita*, 223 S.W.3d 363,

8

367 (Tex. Crim. App. 2006) (quoting *Ex parte White,* 160 S.W.3d 46, 50 (Tex. Crim. App. 2004)). We afford the same deference to the trial court's rulings on "application of law to fact questions" if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Ex parte Peterson*, 117 S.W.3d at 819. In such instances, we use an abuse of discretion standard. *See Ex parte Garcia*, 353 S.W.3d 785, 787 (Tex. Crim. App. 2011). However, if the resolution of those ultimate questions turns on an application of legal standards absent any credibility issue, we review the determination de novo. *Ex parte Peterson*, 117 S.W.3d at 819. We will affirm the trial court's decision if it is correct on any theory of law applicable to the case. *Ex parte Primrose*, 950 S.W.2d 775, 778 (Tex. App.—Fort Worth 1997, pet. ref'd).

## Laches

We first note that the State contends that the doctrine of laches bars appellant's requested habeas relief. Laches is "an equitable common-law doctrine" that may apply in a post-conviction habeas proceeding because "'equity aids the vigilant and not those who slumber on their rights.'" *Ex parte Carrio*, 992 S.W.2d 486, 487 n.2, 488 (Tex. Crim. App. 1999), *modified by Ex parte Perez*, 398 S.W.3d 206 (Tex. Crim. App. 2013) (quoting BLACK'S LAW DICTIONARY 875 (6th ed. 1990)). Habeas relief may be denied when the delay in seeking the relief prejudices the State; however, "the length of delay alone will not constitute either

9

unreasonableness of delay or prejudice." *Id.* at 488; *see Ex parte Perez*, 398 S.W.3d at 216 n.12 (declining to "identify any precise period of time after which laches necessarily applies" but recognizing that delays of more than five years generally may be considered unreasonable absent justification). Recently, the Texas Court of Criminal Appeals reaffirmed the application of laches in deciding whether to grant habeas relief but altered the standard. *See Ex parte Perez*, 398 S.W.3d at 215. "Consistent with the common-law doctrine of laches," the court:

> (1) no longer require[s] the State to make a "particularized showing of prejudice" so that courts may more broadly consider material prejudice resulting from delay, and (2) expand[ed] the definition of prejudice . . . to permit consideration of anything that places the State in a less favorable position, including prejudice to the State's ability to retry a defendant, so that a court may consider the totality of the circumstances in deciding whether to grant equitable relief.

*Id.* (citing *Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1998)). The longer that an applicant delays in filing a habeas application, the less evidence the State must put forth to demonstrate prejudice. *Id.* at 217–18.

Here, the State did not plead or otherwise assert the doctrine of laches in the trial court as a bar to appellant's requested habeas relief. Nevertheless, the State asserts that we should conclude that laches bars relief and, thus, the trial court did not err in denying appellant's habeas application. The State, however, points to no authority to support its contention that we may review on appeal an issue not raised in the trial court. Rather, the State relies on "the new approach" to laches as

10

articulated in *Ex parte Perez,* 398 S.W.3d at 215 (altering standard for "the parameters of the doctrine of laches"). *See also Ex parte Scott*, 190 S.W.3d 672, 676–77 (Tex. Crim. App. 2006) (Cochran, J., concurring) (setting out reasons to apply laches and noting that relief should be denied, although State failed to raise laches and usually it "is a doctrine that must be pled and proven"); *Ex parte Steptoe*, 132 S.W.3d 434, 440 n.21 (Tex. Crim. App. 2004) (Cochran, J., dissenting) (stating that "rebuttable presumption casts the burden of showing a lack of prejudice" on applicant, although State did not raise laches). None of these cases, which involved applications for writs of habeas corpus under Texas Code of Criminal Procedure article 11.07, supports the application of laches in this appeal. *Compare* TEX. CODE CRIM. PROC. ANN. art. 11.07 (Vernon Supp. 2013) (providing procedure for applications for writs of habeas corpus in felony cases), *with* TEX. CODE CRIM. PROC. ANN. art. 11.072, § 8 (Vernon Supp. 2013) (providing for appeal in misdemeanor case in which applicant seeks relief from judgment of conviction ordering community supervision).

The distinction between a writ application made under article 11.07 and an appeal from a trial court's denial of a writ application made under article 11.072 is important. In article 11.07 habeas cases, the Texas Court of Criminal Appeals considers the trial court's findings, conclusions, and recommendations and is "the ultimate finder of fact" and "the trial court's findings are not automatically

11

binding" upon it; "[i]n an article 11.072 habeas case, however, the trial judge is the sole finder of fact." *Ex parte Garcia*, 353 S.W.3d at 787–88.

The State contends that the issue of whether it was required to assert laches in the trial court "is an issue of debate" and the Texas Court of Criminal Appeals is considering the issue of "whether the State must plead laches for a court to consider it in determining whether to grant equitable relief" in *Ex parte Smith*, No. WR-79,465-01, argued on March 19, 2014. *Smith*, however, involves an article 11.07 application for a writ of habeas corpus in which the court is considering the trial court's findings, conclusions, and recommendation that habeas relief be granted. In *Ex parte Perez,* the court observed "that any pleadings invoking laches in the habeas context need only give notice to the opposing side and need not rise to the level of a prima facie showing of particularized prejudice . . . ." 398 S.W.3d at 216 n.13. The court, however, did not address the issue of whether the State must plead laches. *Id.*

In a civil case, a party must plead the affirmative defense of laches. TEX. R. CIV. P. 94. "Laches is a question of fact that should be determined by considering all of the circumstances in each particular case." *In re Mabray*, 355 S.W.3d 16, 22–23 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding [mand. denied]) (citing *Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 669 (Tex. App.—Houston [14th Dist.] 2004, pet. denied)). As noted by the court of

criminal appeals in *Ex parte Perez,* laches "typically requires proof by a preponderance of the evidence of two elements: unreasonable delay by the opposing party and prejudice resulting from the delay." 398 S.W.3d at 210 n.3 (citing *Caldwell*, 975 S.W.2d at 538). Here, the State simply did not afford the trial court the opportunity to address and determine the fact question of laches. An application of the doctrine for the first time on appeal would require this Court to determine a fact issue.

Accordingly, we conclude that the State, by failing to raise the issue of laches in the trial court, waived the defense. *See Proctor v. State*, 967 S.W.2d 840, 844 (Tex. Crim. App. 1998) (concluding that statute of limitations is defense that may be waived or forfeited).

## Ineffective Assistance of Counsel

In his sole issue, appellant argues that he was deprived of the effective assistance of counsel in his 2005 trial "because trial counsel failed to conduct a reasonable pre-trial investigation that would have uncovered readily-available evidence to impeach the credibility of the arresting officer, where his credibility was critical." He asserts that the "trial court's findings that counsel used sound trial strategy are not entitled to deference because his pre-trial investigation was inadequate."

To establish ineffective assistance of counsel, appellant must show that his trial counsel's performance fell below an objective standard of reasonableness and, but for counsel's deficiency, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine counsel's effectiveness, indulging a strong presumption counsel's performance falls within the wide range of reasonable professional assistance or trial strategy. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065; *see Ex parte Jimenez,* 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

Among other points, appellant specifically challenges the trial court's finding and conclusion that trial counsel acted within the accepted practice of a reasonable professional in his impeachment of Officer Lindsey with evidence of a financial motive for making DWI arrests. Appellant argues that trial counsel did not properly investigate the case because he failed to obtain Lindsey's overtime pay records, which were accessible and of which trial counsel had knowledge.

14

Trial counsel has a duty to make an independent investigation of the facts of a case. *Ex parte Welborn*, 785 S.W.2d 391, 395 (Tex. Crim. App. 1990). The United States Supreme Court has explained that "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003) (quoting *Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066). "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wright v. State*, 223 S.W.3d 36, 42 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (citing *Wiggins*, 539 U.S. at 521–22, 123 S. Ct. at 2535). We assess a particular decision not to investigate "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* (citing *Wiggins*, 539 U.S. at 521–22, 123 S. Ct. 2535).

Appellant argues that his trial counsel's defense strategy "was not informed by a reasonable investigation" because he did not obtain and use Lindsey's payroll records at trial. As articulated by trial counsel at the habeas hearing, his defense theory was to "focus on the [arrest] video rather than officer Lindsey." At trial, trial counsel did elicit testimony from Lindsey that he was not on duty at the time

of his testimony, he received "overtime, time and a half" when testifying in court, and he had made 476 DWI arrests in the previous year. However, trial counsel testified at the habeas hearing that he strategically decided not to use Lindsey's overtime pay records to impeach his credibility because he did not want to "beat up" on him and risk angering the jury. In contrast, if the case had been "a no video case where the . . . arresting officer's testimony was all there was," trial counsel "probably would have made a bigger deal in that area or tried to." Trial counsel explained that he placed the issue of Lindsey's credibility at the lower end of importance.

Here, the trial court's findings simply do not support its legal conclusion that trial counsel "acted within the accepted practice of a reasonable professional by *choosing* to impeach Officer Lindsey to the degree he did." (Emphasis added.) The trial court specifically found:

> 17. [Defense counsel] did not elicit the number of DWI trials in which Lindsey testified or the amount of overtime pay that he received the previous year (or during his tenure on the DWI Task Force) and did not argue that he lacked credibility because he was motivated to make DWI arrests to enrich himself and his colleagues.

> 18. Lindsey's payroll records from 1992-2004 reflect that his overtime pay exceeded his regular pay; that his overtime pay encompassed more than 50 percent of his earnings in nine of those 13 years; and that, during the first 11 months of 2004, he made $63,924 in regular pay and $82,032 in overtime pay . . . .

> 19. Lindsey's HPD personnel file reflects he was suspended for 15 days in 1990 for submitting four requests for overtime that he did not

16

work and for forging a prosecutor's signature on an overtime form in a DWI case . . . .

. . . .

27. It was the opinion among the lawyers in Harris County who regularly handled DWI cases during Lindsey's tenure on the DWI Task Force that he arrested many people for DWI in affluent parts of southwest Houston—regardless of how well they performed the field sobriety tests or how sober they appeared to be on videotape—so he could obtain overtime pay for appearing in court pursuant to subpoena to testify at their trials . . . .

28. Some criminal defense lawyers would obtain Lindsey's HPD payroll records pursuant to the Public Information Act before they tried DWI cases in which he would testify and would impeach him with the amount of overtime pay he received to demonstrate his financial motive for making DWI arrests. They typically would argue that he arrested sober drivers for DWI because he knew that they would go to trial, so he would receive overtime pay for appearing in court to testify; that, for this reason, he gave no driver the benefit of the doubt at the scene; that, in effect, he received three days of pay for appearing at a two-day trial; that he received payment even if the defendant were acquitted; and that his overtime pay exceeded his regular pay during his tenure on the DWI Task Force; [and]

29. Some criminal defense lawyers trying a DWI case in which Lindsey was a key prosecution witness in 2005 would have obtained his HPD payroll and disciplinary records; elicited on cross-examination the amount of overtime pay he had received; and argued that his opinion that the driver was intoxicated was not credible because he had a financial motive to make the arrest.

Critically, the trial court further found that trial counsel "did not have Lindsey's HPD payroll or disciplinary records at the time of [appellant's] trial" and "the amount of overtime pay that Lindsey had received was admissible to show his financial interest and motive for making DWI arrests . . . ." It further found that

17

"[h]ad [trial counsel] elicited the amount of overtime pay that Lindsey had received for testifying in DWI cases, he could have argued that Lindsey arrested [appellant] so he and his fellow DWI Task Force officers could receive overtime pay for testifying."

Given the trial court's specific findings, by which we are bound, we must conclude that it was not reasonable for trial counsel to decide not to impeach Officer Lindsey's testimony and argue that he lacked credibility or had an improper motive to arrest appellant without actually investigating Lindsey's well-known overtime-pay abuse by obtaining his payroll records. The resolution of the ultimate question presented to us does not turn on an evaluation of trial counsel's credibility or demeanor. *See Ex parte Peterson*, 117 S.W.3d at 819. An investigation that did not include obtaining the payroll records, which were available and readily detailed the vast extent of Lindsey's overtime-pay abuse, does not reflect reasonable professional judgment. *See Wiggins*, 539 U.S. at 534, 123 S. Ct. at 2541–42. The fact that the scene video was "good" for appellant did not put trial counsel in the position of having to choose between focusing on the video or Lindsey's credibility. Accordingly, we hold that trial counsel's performance was deficient. *See Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066.

To prevail on his claim of ineffective assistance, appellant not only must show deficient performance by trial counsel but also, beyond a reasonable

18

probability, that, but for counsel's deficient performance, a different result would have occurred. *Thompson*, 9 S.W.3d at 812. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Hernandez v. State*, 726 S.W.3d 53, 55 (Tex. Crim. App. 1986)).

As found by the trial court, the arrest video "alone does not establish that [appellant] had lost the normal use of his physical and mental faculties as a result of intoxication" and, thus, "the State relied substantially on [Officer] Lindsey's opinion regarding intoxication" and his "opinion that [appellant] was intoxicated to convict him." Lindsey was the only officer who formed, and testified to, an opinion that appellant was intoxicated at the time of his arrest. The trial court did find that trial counsel provided the jury with "the inference that Officer Lindsey was financially motivated to make arrests." However, it further found that trial counsel "could have argued that Lindsey arrested [appellant] so he and his fellow DWI Task Force officers could receive overtime pay for testifying" if trial counsel had "elicited the amount of overtime pay that Lindsey had received for testifying in DWI cases . . . ." As the trial court findings readily demonstrate, trial counsel could have used Lindsey's payroll records to provide more than an inference of Lindsey's financial motive in arresting appellant. He could have provided direct evidence that Lindsey actually engaged in overtime-pay abuse. Because the arrest video alone does not establish that appellant was intoxicated at the time he was

19

stopped by Lindsey, and the State substantially relied on Lindsey's opinion regarding intoxication, his credibility was crucial to conviction. Thus, direct evidence of Lindsey's overtime-pay abuse in DWI cases could have significantly affected the outcome of the case.

We hold that there is a reasonable probability, sufficient to undermine our confidence in the outcome of the case, that but for the deficient performance of trial counsel, the result of the proceedings would have been different. Accordingly, we further hold that the trial court abused its discretion in denying appellant's application for a writ of habeas corpus. We sustain appellant's sole issue.[5]

---

[5]    Appellant also contends that the trial court erred in denying his application because counsel rendered ineffective assistance by failing to (1) present evidence that jet skiing does not require physical dexterity, and (2) use appellant's medical records to corroborate Officer Lindsey's testimony that appellant stated that he had previously injured his ankle and knee. Because we conclude that trial counsel's performance was deficient and harmful based on his failure to investigate Officer Lindsey's overtime-pay abuse, we need not address these contentions.

20

**Conclusion**

We reverse the order of the trial court denying appellant's application for a writ of habeas corpus, and we grant him habeas relief. We set aside the judgment of conviction, signed on January 11, 2005, in cause number 1260469 in County Criminal Court at Law No. 2 of Harris County. We remand the cause for further proceedings consistent with this opinion.

Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

Publish. TEX. R. APP. P. 47.2(b).