**Opinion issued January 12, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-01045-CR

———————————

## EX PARTE RICHARD MARK BOWMAN, Appellant

———————————————————————————————————————

**On Appeal from the County Criminal Court at Law No. 2
Harris County, Texas
Trial Court Case No. 1921607**

———————————————————————————————————————

## OPINION ON REMAND

Appellant, Richard Mark Bowman, challenges the trial court's order denying his application for a writ of habeas corpus.[1]  In two issues, appellant contends that

---

[1]  *See* TEX. CODE CRIM. PROC. ANN. art. 11.072, § 8 (Vernon 2015) (providing for appeal in misdemeanor case in which applicant seeks relief from judgment of conviction ordering community supervision), art. 11.09 (Vernon 2005) (providing person confined on misdemeanor charge may apply for writ of habeas corpus).  A person who is subject to "collateral consequences" resulting from a conviction is considered confined. *See State v. Collazo*, 264 S.W.3d 121, 126–27 (Tex. App.— Houston [1st Dist.] 2007, pet. ref'd); *see, e.g., Tarvin v. State*, 01-08-00449-CR,

the trial court erred in concluding that the State's defense of laches bars his claim for habeas corpus relief, which he asserts on the ground of ineffective assistance of trial counsel, and in further denying him such relief on the merits from a judgment of conviction of the misdemeanor offense of driving while intoxicated ("DWI").[2]

In appellant's initial appeal, the State, for the first time on appeal, contended that the defense of laches bars his claim for habeas corpus relief. Noting that the State, in asserting the defense of laches on appeal, had failed to raise the defense in the trial court and had "not afford[ed] the trial court the opportunity to address and determine the fact question of laches," we held that the State had waived the defense. *Ex parte Bowman*, 444 S.W.3d 272, 279 (Tex. App.—Houston [1st Dist.]), *pet. granted, judgm't vacated*, 447 S.W.3d 887 (Tex. Crim. App. 2014). We further held that trial counsel's performance was deficient and there is a reasonable probability that but for counsel's deficient performance, the result of the proceedings would have been different. *Id*. at 281–282. Accordingly, we reversed the trial court's order denying appellant habeas corpus relief. *Id*. at 282.

The State subsequently filed a petition for discretionary review with the Texas Court of Criminal Appeals, arguing in part that "it was not required to raise

---

2011 WL 3820705, at *3 (Tex. App.—Houston [1st Dist.] Aug. 25, 2011, no pet.) (mem. op., not designated for publication) (concluding defendant invoked trial court's habeas jurisdiction when prior misdemeanor conviction used to enhance subsequent misdemeanor offense to third-degree felony offense).

[2] *See* TEX. PENAL CODE ANN. § 49.04 (Vernon Supp. 2015).

2

[the defense of] laches in the trial court in order for it to be addressed on appeal." *Ex parte Bowman*, 447 S.W.3d 887, 888 (Tex. Crim. App. 2014). Although the court of criminal appeals agreed with this Court that "[l]aches is a question of fact" and "the trial judge is the sole finder of fact," it further held that the State had not waived the defense of laches by failing to assert the defense in the trial court. *Id*. at 888. The court then vacated the judgment of this Court and remanded the case back to us to further remand it back to the trial court to conduct an evidentiary "hearing on the laches issue." *Id*. at 888–89.

On remand, we again reverse the order of the trial court.

## Background

At appellant's trial in 2005, Houston Police Department ("HPD") Officer W. Lindsey, Jr., who was assigned to the HPD DWI Task Force, testified that he arrested appellant at approximately 1:00 a.m. on September 24, 2004 for DWI. He initiated a traffic stop of appellant for driving his sport utility vehicle ("SUV") approximately sixty miles per hour in a thirty-five-mile-per-hour zone on Westheimer Road. According to Lindsey, appellant's SUV was not weaving and, other than speeding, his driving was legal. When Lindsey first approached appellant, who had pulled his SUV over into the parking lot of "Treasures," Lindsey noted that appellant had a dazed look and a strong odor of alcohol on his breath.

3

Officer Lindsey explained that because appellant initially refused to perform standard field sobriety tests, he handcuffed appellant and told him that he was under arrest. Appellant then agreed to perform the tests, and Lindsey removed the handcuffs. In answering Lindsey's questions before he administered the tests, appellant stated that he had a bad knee and ankle, had broken them in a jet-skiing accident, and took only aspirin for the pain. When asked if he participated in outdoor activities, appellant answered that he did. Lindsey then administered horizontal-gaze-nystagmus ("HGN") and walk-and-turn tests, and he noted "clues" on each test indicating that appellant was intoxicated. Lindsey also administered a one-leg-stand test, but soon after starting, appellant stated that he could not perform the test. In Lindsey's opinion, appellant could not perform the test because he was intoxicated. Based on his training and experience, his observations that night, and the totality of the field sobriety tests, Lindsey opined that appellant was intoxicated, had lost the normal use of his physical and mental faculties from the use of alcohol, and posed a danger to himself and others. The entire traffic stop, including the field sobriety tests, was recorded on the camera in Lindsey's patrol car.

On cross-examination, Officer Lindsey testified that a knee or ankle injury could possibly invalidate the one-leg-stand and walk-and-turn tests. Appellant's trial counsel also elicited testimony from Lindsey about his overtime pay and DWI

4

arrest record. Lindsey explained that he was not on duty while testifying at appellant's trial, but was being paid "overtime, time and a half" and received overtime pay whenever he made an arrest and went to court. He noted that he "solely" made DWI arrests, and he had made 476 arrests during the previous year.

HPD Officers R. Cibulski and C. Green, also assigned to the HPD DWI Task Force, testified at appellant's trial that they observed appellant after he had been transported to a police station after his arrest. Cibulski testified that appellant refused to give him a breath sample or sign the statutory warning form, but appellant did ask to give a blood sample. When talking with appellant, Cibulski noted that appellant had a strong odor of alcohol on his breath, red bloodshot eyes, and slurred speech. Cibulski, however, did not form an opinion as to whether appellant was intoxicated. Green testified that appellant refused to perform standard field sobriety tests on video at the station, but appellant did not say that he was unable to perform the tests. According to Green, appellant did not look injured or limp when he came into the station, and he did not complain of an injury. Green also noted a strong odor of alcohol on appellant's breath and that he had glassy eyes. However, Green did not form an opinion as to whether appellant was intoxicated because he had refused to perform the field sobriety tests. The court admitted into evidence the HPD video recording of appellant during the traffic stop and at the police station.

Stephanie Burke, appellant's friend, testified at trial that appellant had been at her house from about 10:00 p.m. to 12:45 a.m. on the night that he was arrested. She had given appellant a glass of wine, but she did not know how much he had drunk or how much he had had to drink earlier in the day. During their time together, they talked and watched a movie, and appellant fell asleep. Burke explained that appellant, who had told her that he had been jet skiing, either all day or all afternoon, appeared to be acting normally when he left her house.

The jury found appellant guilty, and the trial court assessed his punishment at confinement for 180 days, suspended the sentence, placed him on community supervision for one year, and assessed a fine of $800.

In April 2013, the State again charged appellant by information with the offense of DWI, and the State included in the information a paragraph in which it alleged the 2005 conviction as an enhancement.[3] Appellant then filed his application for a writ of habeas corpus, seeking relief from the 2005 judgment of conviction and arguing that his trial counsel was ineffective because he failed to (1) impeach Officer Lindsey with the amount of his overtime pay for testifying at DWI trials and argue that he was motivated to make DWI arrests for financial gain,

---

[3]  The record reflects that the State abandoned the enhancement allegation, and appellant, without an agreed punishment recommendation, pleaded guilty to the misdemeanor offense of DWI as a first offender. On March 27, 2014, the trial court found appellant guilty of the offense and assessed his punishment at confinement for three days.

6

(2) offer evidence that physical dexterity is not required to jet ski, and (3) offer medical records to prove appellant's ankle injury. In regard to trial counsel's failure to impeach Lindsey with the amount of his overtime pay for testifying in DWI trials, appellant complained that:

> Competent defense lawyers would obtain [Lindsey's] HPD payroll records pursuant to the Public Information Act before they tried DWI cases in which he was going to testify and would impeach him with the amount of overtime pay he received to demonstrate his financial motive for making DWI arrests. They typically would argue that he arrested sober drivers for DWI because he knew that they would go to trial, so he would receive overtime pay for appearing in court to testify; that, for this reason, he gave no driver the benefit of the doubt at the scene; that, in effect, he received three days of pay for appearing at a two-day trial; that he received the money even if the defendant were acquitted; and that his overtime pay exceeded his regular pay during his tenure on the DWI Task Force. Arguments of this nature frequently persuaded juries to reject Lindsey's opinion regarding intoxication.

The trial court held a hearing on the application, and appellant's trial counsel testified. Appellant offered, and the trial court admitted, without objection from the State, a portion of the trial record; affidavits of three criminal defense attorneys regarding impeachment of Officer Lindsey's testimony with his overtime pay records; the trial judge's affidavit indicating that he would have allowed Lindsey to answer questions posed about the amount of his overtime pay; documents reflecting Lindsey's 1990 suspension from HPD, his pay between 1992 and 2004, and his ultimate resignation from HPD; a Houston Chronicle article detailing the abuse of overtime pay by HPD DWI Task Force officers and Lindsey's HPD

7

disciplinary violations; appellant's affidavit about his injury and the physical dexterity required for jet skiing; his medical records related to his ankle injury; and a picture of a seated person riding a jet ski. The trial court also admitted, without objection from the State, the HPD video recording of appellant made the night of his arrest. And appellant testified that, in the event of a retrial, he would stipulate to the admissibility of the video recording.

After the conclusion of the hearing, the trial court signed findings of fact and conclusions of law. It found that in the 2005 trial:

> Defense counsel . . . argued that [appellant's] driving was legal except for speeding; that Lindsey arrested him based on probable cause to believe that he was intoxicated rather than on proof beyond a reasonable doubt; that Cibulski and Green did not conclude that he was intoxicated; and that he told Lindsey that he could not perform the field sobriety tests because he had a bad knee and ankle which, according to a law enforcement manual, would invalidate the tests. *[Defense counsel] did not argue that Lindsey lacked credibility or had an improper motive to arrest [appellant].*
>
> The prosecutor countered that a leg injury could not affect the HGN test, which [appellant] failed; that [appellant] failed the walk and turn test; that [appellant] would rather lose his driver's license for six months than have the jury learn the result of a breath test; that his leg injury could not be that bad if he had been jet skiing all day; and that he did not bring medical records to corroborate an injury.

(Emphasis added.) The trial court also specifically found that "[defense counsel] did not have Lindsey's HPD payroll or disciplinary records at the time of [appellant's] trial." However, the court concluded that trial counsel's "representation was well within the wide range of reasonable professional

8

assistance" and appellant "cannot show that but for the alleged failings of the defense counsel, the result would have been different." Thus, the trial court denied appellant habeas corpus relief.

The trial court, upon our remand of the case to it on the State's defense of laches, conducted a second evidentiary hearing and made supplemental findings of fact and conclusions of law. At the hearing, the trial court heard the testimony of HPD Officers Lindsey, Cibulski, and Green, the officers who had originally testified at appellant's 2005 trial. Appellant, his trial counsel, and two other attorneys whom appellant had retained in 2005 also testified. At the end of the hearing, the trial court stated its findings of fact and conclusions:

> The Court is going to find that the delay was unreasonable because of the sole reason [appellant] filed the post-conviction writ of habeas corpus was in an effort to have his first conviction voided out so he would not be looking at a minimum of 30 days in jail on a second DWI.
>
> The Court is going to find that he consulted with three lawyers about appealing his conviction and did rely upon the advice of those three lawyers who had reviewed the record that there was no basis for appeal. The record is totally silent as to whether or not any of those three lawyers were of the opinion that [trial counsel's] representation of [appellant] during the trial was ineffective, which would have entitled him to equitable relief on the writ of habeas corpus.
>
> The Court is going to find that the State is absolutely materially prejudiced as a result of the delay, that there would be absolutely zero likelihood of the State being able to obtain a conviction on a misdemeanor DWI accusation on facts that are more than ten years old.

The Court is going to find that he is not entitled to equitable relief for any other compelling reasons. There's no evidence he's actually innocent.

That being said, the Court will also find that since the Court's prior ruling in the writ was that [appellant] was not entitled to relief because he did not receive ineffective assistance during trial, I don't understand how a person would not always be entitled to relief when the Court of Appeals has found that he received ineffective assistance during the trial.

During the hearing, the trial court stated that "[t]he witnesses are available, all three fact witness. . . . And the video. They are, they are available with certainty, no doubt." And the trial court declined to find that the State's ability to retry the case was diminished.

## Standard of Review

An applicant seeking post-conviction habeas corpus relief must prove his claims by a preponderance of the evidence. *Ex parte Richardson*, 70 S.W.3d 865, 870 (Tex. Crim. App. 2002). In reviewing a trial court's decision to deny habeas relief, we view the facts in the light most favorable to the trial court's ruling. *Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003), *overruled in part on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007). We afford almost total deference to the trial court's findings of fact that are supported by the record, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Ex parte Amezquita*, 223 S.W.3d 363, 367 (Tex. Crim. App. 2006) (quoting *Ex parte White*, 160 S.W.3d 46, 50 (Tex. Crim.

App. 2004)).  We afford the same deference to the trial court's rulings on "application of law to fact questions" if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor.  *Ex parte Peterson*, 117 S.W.3d at 819. In such instances, we use an abuse-of-discretion standard.  *See Ex parte Garcia*, 353 S.W.3d 785, 787 (Tex. Crim. App. 2011).  However, if the resolution of those ultimate questions turns on an application of legal standards absent any credibility issue, we review the determination de novo.  *Ex parte Peterson*, 117 S.W.3d at 819.  We will affirm the trial court's decision if it is correct on any theory of law applicable to the case.  *Ex parte Primrose*, 950 S.W.2d 775, 778 (Tex. App.—Fort Worth 1997, pet. ref'd).

### Laches

In his first issue, appellant argues that the trial court erred in concluding that the State's defense of laches bars his claim for habeas corpus relief because the State has not been materially prejudiced due to any delay, as the State still has available to it for retrial the witnesses and evidence that it presented at his 2005 trial, and any delay in seeking such relief was not unreasonable, as the delay was justified.

The Texas Constitution expressly provides, "The writ of habeas corpus is a writ of right, and *shall never be suspended*."  TEX. CONST. art. I, § 12 (emphasis

11

added). However, the Texas Court of Criminal Appeals, in 1999,[4] "agree[d] with the State that the doctrine of laches is a theory which [the court] may, and should, employ in [its] determination of whether to grant [habeas] relief in any given 11.07 case." *Ex parte Carrio*, 992 S.W.2d 486, 488 (Tex. Crim. App. 1999); *see* TEX. CODE CRIM. PROC. ANN. art. 11.07 (Vernon 2015). Relying on former rule 9(a) of the Rules Governing Section 2254 Cases in the United States District Courts and federal case law interpreting it, the court noted that in federal courts it was "the burden of the State 'to (1) make a *particularized* showing of prejudice, (2) show that the prejudice was *caused* by the petitioner having filed a late petition, and (3) show that the petitioner has not acted with reasonable diligence as a matter of law.'" *Ex parte Carrio*, 992 S.W.2d at 488 (quoting *Walters v. Scott*, 21 F.3d 683, 686–87 (5th Cir. 1994)). And "the type of prejudice the State must show is *prejudice in its ability to respond to the allegations in the petition*." *Id*. at 488 (emphasis added) (citing *Walters*, 21 F.3d at 687). The court also noted that if the State made "its showing of these elements, it [was] then the burden of the

---

[4]     Prior to May 1999, the Texas Court of Criminal Appeals had "never denied relief on a valid claim [for habeas corpus relief] due to an applicant's delay in bringing the claim. On the contrary, [it had expressly stated] that 'we have no desire to impose upon defendants the requirement that claims for relief be asserted within a specified period of time.'" *Ex parte Carrio*, 992 S.W.2d 486, 487 (Tex. Crim. App. 1999) (quoting *Ex parte Galvan*, 770 S.W.2d 822, 824 (Tex. Crim. App. 1989)). Indeed, the court had previously explained that "[s]uch a rule would be *arbitrary and probably unconstitutional*." *Ex parte Galvan*, 770 S.W.2d at 824 (emphasis added) (citing TEX. CONST. art. I, § 12).

12

petitioner, in federal court, to show either that the state actually ha[d] not been prejudiced or that the petitioner's delay [was] justified under the rule." *Id.* (citing *Walters*, 21 F.3d at 687).

In 2013, the Texas Court of Criminal Appeals stated that after it had, in *Carrio*, "implicitly" adopted "the federal laches standard" of rule 9(a) and federal case law interpreting it, "the State's [laches] burden has been impossibly high primarily due to the requirement that the State make a particularized showing of prejudice to its ability to respond to the [habeas corpus] application." *Ex parte Perez*, 398 S.W.3d 206, 212–14 (Tex. Crim. App. 2013) (citing *Ex parte Carrio*, 992 S.W.2d at 487–88; *Ex parte Wolf*, 296 S.W.3d 160, 167 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd)). Because the court concluded that "the federal laches standard" that it had adopted had proven to be "ineffective at weeding out stale claims in Texas post-conviction cases," it "abandon[ed] that formulaic standard in favor of the more flexible common-law approach to laches in the post-conviction context." *Id.* at 214–15. Thus, the court of criminal appeals eased the State's burden in habeas corpus cases by adopting "Texas common law, rather than the federal standard, to define the parameters" of the defense of laches in Texas habeas corpus cases:

> Consistent with the common-law doctrine of laches, going forward, we will (1) *no longer require the State to make a "particularized showing of prejudice"* so that courts may more broadly consider material prejudice resulting from delay, and (2) expand the definition

13

of prejudice under the existing laches doctrine *to permit consideration of anything that places the State in a less favorable position*, *including prejudice to the State's ability to retry a defendant*, so that a court may consider the totality of the circumstances in deciding whether to grant equitable relief.

*Id*. at 215 (emphasis added) (citing *Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1998)).

The common-law doctrine of laches is defined as:

neglect to assert right or claim which, taken together with lapse of time and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity. Also, it is the neglect for an unreasonable and unexplained length of time under circumstances permitting diligence, to do what in law, should have been done.

*Ex parte Carrio*, 992 S.W.2d at 487 n.2 (quoting BLACK'S LAW DICTIONARY 875 (6th ed. 1990)). In Texas civil cases, laches is an affirmative defense that must be pleaded by the party asserting it. TEX. R. CIV. P. 94. And "[l]aches is a question of fact that should be determined by considering all of the circumstances in each particular case." *In re Mabray*, 355 S.W.3d 16, 22–23 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding [mand. denied]) (citing *Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 669 (Tex. App.—Houston [14th Dist.] 2004, pet. denied)).

In *Ex parte Perez*, the court explained that the defense of laches "typically requires proof by a preponderance of the evidence of two elements: unreasonable delay by the opposing party and *prejudice resulting from the delay*." 398 S.W.3d

at 210 n.3 (emphasis added) (citing *Caldwell*, 975 S.W.2d at 538). Thus, the defense of laches will bar habeas corpus relief "when an applicant's unreasonable delay has prejudiced the State, thereby rendering consideration of his claim inequitable." *Id.* at 219 (citing *Ex parte Carrio*, 992 S.W.2d at 487).

In determining the issue of laches in habeas corpus cases, courts are to consider the totality of the circumstances, i.e., "factors such as the length of the applicant's delay in filing the application, the reasons for the delay, and the degree and type of prejudice resulting from the delay." *Id.* at 217. In regard to prejudice, "a court may draw reasonable inferences from the circumstantial evidence to determine *whether excessive delay has likely compromised the reliability of a retrial*." *Id.* (emphasis added). However, even if the State presents proof of prejudice, a court still "must then weigh that prejudice against any equitable considerations that militate in favor of granting habeas relief." *Id.*

In regard to the degree of proof required, "the extent of the prejudice the State must show bears an inverse relationship to the length of the applicant's delay." *Id.* Thus, "the longer an applicant delays filing his application, and particularly when an applicant delays filing for much more than five years after conclusion of direct appeals, the less evidence the State must put forth in order to demonstrate prejudice." *Id.* at 217–18. Although a delay of more than five years "may generally be considered unreasonable in the absence of any justification for

15

the delay," the court refused "to adopt a rebuttable presumption of prejudice to the State after [any] specified period of time." *Id.* at 210, 216 n.12.

In summing up its "expan[sion] of the scope of the prejudice inquiry," the court of criminal appeals was careful to emphasize that it was "leav[ing] intact the equitable principles" that necessarily defeat the State's reliance upon the defense of laches when a record reveals:

- an applicant's delay was not unreasonable because it was due to a justifiable excuse or excusable neglect;

- the State would not be materially prejudiced as a result of the delay; or

- the applicant is entitled to equitable relief for other compelling reasons, such as new evidence that shows he is actually innocent of the offense or, in some cases, that he is reasonably likely to prevail on the merits.

*Id.* at 218 (citing *Ex parte Blue*, 230 S.W.3d 151, 170 (Tex. Crim. App. 2007) (Keller, P.J., concurring) (courts possess "equitable discretion" to ensure "federal constitutional errors do not result in the incarceration of innocent persons") (quoting *Herrera v. Collins*, 506 U.S. 390, 404–05, 113 S. Ct. 853, 862 (1993)); *Ex parte Scott*, 190 S.W.3d 672, 675 (Tex. Crim. App. 2006) (Cochran, J., concurring) (suggesting equitable relief warranted notwithstanding applicant's delay in seeking habeas corpus relief where applicant shows court of appeals wrongly affirmed conviction)).

Appellant first argues that the trial court erred in concluding that his delay in seeking habeas corpus relief would materially prejudice the State because the State still has available to it for retrial all of the witnesses and evidence that it presented at his 2005 trial. In response, the State argues that the trial court did not err in denying appellant habeas corpus relief "because the State would be prejudiced in retrying a case over ten years old."

After conducting its evidentiary hearing on the State's defense of laches, the trial court specifically found that the three HPD officers who testified at appellant's 2005 trial and the HPD video recording of appellant, made on the night of his arrest and introduced into evidence at the 2005 trial and in the original habeas corpus hearing, are actually available for retrial. As the trial court stated, "The witnesses are available, all three fact witness. . . . And the video. They are, they are available with certainty, no doubt." And the evidence presented at the hearing supports this finding. Indeed, all three of the HPD officers who testified at appellant's 2005 trial testified at the evidentiary hearing on the State's defense of laches. And the trial court declined to find that the State's ability to retry the case was diminished. Regardless, the trial court further generally found that "the State is absolutely materially prejudiced as a result of the delay" because "there would be absolutely zero likelihood of the State being able to obtain a conviction on a

17

misdemeanor DWI accusation *on facts that are more than ten years old.*" (Emphasis added.)

At the laches hearing, Officer Lindsey testified that he currently teaches in the Klein Independent School District and his Texas driver's license contains his current home address. Officer Green testified that he is currently employed with the Harris County Constable's Office, Precinct 1, and the State has called him to testify at DWI trials since he left HPD in 2005. And Officer Cibulski testified that he is currently employed with the HPD Traffic Enforcement Division. Moreover, appellant testified that Stephanie Burke, who testified at his 2005 trial, currently lives in Houston and is available to testify at retrial. He further testified that, in the event of a retrial, he would stipulate to the admissibility of the HPD video recording of him made the night of his arrest.

The record also reveals not only that the witnesses and evidence from appellant's 2005 trial are available for retrial, but also that the HPD officers who testified in 2005 could use the HPD offense report, the HPD video recording, and the transcript of the 2005 trial to refresh their memories for retrial. The record also demonstrates that the substance of their retrial testimony would be the same as that of their 2005 trial testimony.

More specifically, Officer Green testified that he had worked on the HPD DWI Task Force for approximately seven years, averaged approximately two DWI

arrests each night during that time period, and made "several thousand DWI arrests." In appellant's case, he only "did the station video." Green explained that in other cases in which he testified after having left HPD, he had to refresh his memory by reading the HPD offense reports, looking at the video recordings of the defendants, or doing both because "otherwise, they all run together." Although he did not remember appellant's case after reading the offense report and 2005 trial transcript, and did not have "a direct memory of what happened in this case," he would, if he had to testify at a retrial of appellant's case, be able to refresh his memory by viewing the station portion of the HPD video recording of appellant and rereading his 2005 trial testimony. Green further explained that his 2005 testimony that he did not have an opinion as to whether appellant was intoxicated on the night of his arrest "was based on the fact that [appellant had] refused to perform tests and, therefore, . . . [Green] couldn't base [his] opinion on it." He noted that his testimony at a retrial would be the same.

Officer Cibulski testified that he had worked on the HPD DWI Task Force for eleven years, during which time he had made "thousands" of DWI arrests. He did note that reading the HPD offense report and 2005 trial transcript did not refresh his memory about appellant's case and "[t]he only thing he [could testify to] is what [he] wrote down; [his] notes from that night." However, based on his reading of the trial transcript, Cibulski's involvement in the case was limited to

19

offering appellant a breath test after his arrest. And Cibulski was able to refresh his memory about appellant's refusal to take that test by reading the "DIC-24" form contained in the trial court record. Because appellant had refused to take the breath test offered to him, Cibulski had no opinion as to whether appellant was intoxicated. And Cibulski's lack of an opinion on the issue would not change at a retrial.

Officer Lindsey testified that he had worked on the HPD DWI Task Force for six years and "was involved with anywhere from 15[,000] to 20,000" DWI arrests. He noted that other than appellant stopping his SUV in the "Treasures" parking lot, nothing about the case stood out to him. Although Lindsey did not remember appellant's case based on his independent recollection, he did remember it based on refreshing his memory. And he likely could refresh his memory for retrial by reviewing the HPD offense report "as in any stop arrest I would have made before I left the department." Lindsey explained that given the number of DWI arrests that he had made, he would have to refresh his memory in each case in which he testified because "they all run together." And he did not think that "any officer can be expected to remember six months, a year, let alone ten and a half years later the exact details without being able to refresh one's memory to hopefully at least bring back some knowledge as to what took place that night." According to Lindsey, everything he testified about at the 2005 trial was shown on

the HPD video recording of appellant, and he probably looked at the video before testifying in 2005. And, in appellant's case, Lindsey noted that his ability to refresh his memory would actually be "enhanced" because he has not only the video, but also his 2005 trial testimony to review.

As noted above, the evidence presented at the hearing on the State's defense of laches supports the trial court's specific finding that the three HPD officers who had testified at appellant's 2005 trial and the HPD video recording of appellant made on the night of his arrest, and introduced into evidence at the 2005 trial and original habeas corpus hearing, are actually available for retrial. However, the State presented no evidence to support the trial court's general finding that "the State is absolutely materially prejudiced as a result of the delay" because "there would be absolutely zero likelihood of the State being able to obtain a conviction on a misdemeanor DWI accusation *on facts that are more than ten years old*." (Emphasis added.)

Again, the Texas Court of Criminal Appeals, as it emphasized in *Ex parte Perez*, expressly refused "to adopt a rebuttable presumption of prejudice to the State after [any] specified period of time." 398 S.W.3d at 210, 216 n.12. The court did explain that "the longer an applicant delays filing his application, and particularly when an applicant delays filing for much more than five years after conclusion of direct appeals, *the less evidence* the State must put forth in order to

21

demonstrate prejudice." *Id*. at 217–18 (emphasis added). However, the State, in asserting the defense of laches must necessarily present *some evidence* of material prejudice actually caused by an unreasonable delay.

In its brief on remand, the State addresses the issue of material prejudice in a single paragraph, less than one-half page in length, merely asserting that appellant's delay "caused memory lapses in the testimony of the witnesses"; "[a]ll three officers involved in appellant's arrest in 2004 had no independent recollection of appellant's case"; "[w]hile they could regurgitate what they testified to at the prior trial, it would not be from a memory of the day of his arrest"; and appellant's attorneys "have possession of the only functioning copy of the scene video of his arrest." It concludes "*appellant's unreasonable delay* supports a finding of prejudice to the State to try a case over ten years after appellant's arrest." (Emphasis added.)

The State, as did the trial court, conflates delay with prejudice. Standing alone, the mere fact that the facts of appellant's case "are more than ten years old" does not serve to establish material prejudice to the State in retrying its case against appellant. Rather, the proper consideration in regard to prejudice is "the degree and type of prejudice resulting from the delay," i.e., "whether excessive delay *has likely compromised the reliability of a retrial*." *Id*. at 217 (emphasis added). And even when the State presents some proof of prejudice, a court still

22

"must then weigh that prejudice against any equitable considerations that militate in favor of granting habeas relief." *Id.*

The only facts of consequence that Officer Green testified to in appellant's 2005 trial are that appellant refused to perform field sobriety tests and, thus, Green could not opine as to whether appellant was intoxicated on the night of his arrest. Likewise, the only facts of consequence that Officer Cibulski testified to in appellant's 2005 trial are that appellant refused to submit to a breath test and, thus, Cibulski could not opine as to whether appellant was intoxicated on the night of his arrest. Whether these two officers testify about the above indisputable facts from their independent recollection or from their review of the HPD offense report, the HPD video recording of appellant, and other previously admitted evidence cannot reasonably be of any importance to a fact finder. And although Officer Lindsey, the officer who actually stopped and arrested appellant for DWI, did not remember appellant's case based on his independent recollection, he did remember it based on refreshing his memory.

As noted above, Officer Lindsey clearly testified at the laches hearing that he could refresh his memory for retrial by reviewing the HPD offense report as he had previously done "in any stop arrest I would have made *before I left the department.*" (Emphasis added.) Indeed, given the number of DWI arrests that he had made, Lindsey had to refresh his memory in each case in which he testified

because "they all run together," and he did not think that "any officer can be expected to remember *six months*, *a year*, let alone ten and a half years later the exact details without being able to refresh one's memory to hopefully at least bring back some knowledge as to what took place that night." (Emphasis added.) And, as per Lindsey, everything he testified about at the 2005 trial is shown on the HPD video recording of appellant, which Lindsey probably reviewed before testifying against appellant in 2005. Moreover, Lindsey explained that his ability to refresh his memory in appellant's case is actually "enhanced" because Lindsey not only has access to review the HPD video recording of appellant, but also his own 2005 trial testimony.

The record reveals that not only did the State fail to present to the trial court any evidence to establish that appellant's delay in seeking habeas corpus relief would materially prejudice the State in retrying its case against appellant, but also appellant actually presented affirmative evidence that the State "would not be materially prejudiced as a result of [his] delay" in seeking habeas corpus relief. *See Ex parte Perez*, 398 S.W.3d at 218. Accordingly, we hold that the trial court erred in concluding that appellant's delay in seeking habeas corpus relief would materially prejudice the State in retrying appellant's DWI case.[5]

We sustain appellant's first issue.

---

[5] Having so held, we need not address appellant's next argument that any delay by him in seeking such relief was not unreasonable because it was justified.

## Ineffective Assistance of Counsel

In his second issue, appellant argues that he was deprived of the effective assistance of counsel in his 2005 trial "because trial counsel failed to conduct a reasonable pre-trial investigation that would have uncovered readily-available evidence to impeach the credibility of the arresting officer, where his credibility was critical." He asserts that the "trial court's findings that counsel used sound trial strategy are not entitled to deference because his pre-trial investigation was inadequate."

To establish ineffective assistance of counsel, appellant must show that his trial counsel's performance fell below an objective standard of reasonableness and, but for counsel's deficiency, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine counsel's effectiveness, indulging a strong presumption counsel's performance falls within the wide range of reasonable professional assistance or trial strategy. *Id.* at 689, 104 S. Ct. at 2065; *see Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

25

Among other points, appellant specifically challenges the trial court's finding and conclusion that trial counsel acted within the accepted practice of a reasonable professional in his impeachment of Officer Lindsey with evidence of a financial motive for making DWI arrests. Appellant argues that trial counsel did not properly investigate the case because he failed to obtain Lindsey's overtime-pay records, which were accessible and of which trial counsel had knowledge.

Trial counsel has a duty to make an independent investigation of the facts of a case. *Ex parte Welborn*, 785 S.W.2d 391, 395 (Tex. Crim. App. 1990). The United States Supreme Court has explained that "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003) (quoting *Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066). "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wright v. State*, 223 S.W.3d 36, 42 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (citing *Wiggins*, 539 U.S. at 521–22, 123 S. Ct. at 2535). We assess a particular decision not to investigate "for reasonableness in all the circumstances,

applying a heavy measure of deference to counsel's judgments." *Id.* (citing *Wiggins*, 539 U.S. at 521–22, 123 S. Ct. 2535).

Appellant argues that his trial counsel's defense strategy "was not informed by a reasonable investigation" because he did not obtain and use Lindsey's payroll records at trial. As articulated by trial counsel at the habeas hearing, his defense theory was to "focus on the [arrest] video rather than Officer Lindsey." At trial, trial counsel did elicit testimony from Lindsey that he was not on duty at the time of his testimony, he received "overtime, time and a half" when testifying in court, and he had made 476 DWI arrests in the previous year. However, trial counsel testified at the habeas hearing that he strategically decided not to use Lindsey's overtime-pay records to impeach his credibility because he did not want to "beat up" on him and risk angering the jury. In contrast, if the case had been "a no video case where the . . . arresting officer's testimony was all there was," trial counsel "probably would have made a bigger deal in that area or tried to." Trial counsel explained that he placed the issue of Lindsey's credibility at the lower end of importance.

Here, the trial court's findings simply do not support its legal conclusion that trial counsel "acted within the accepted practice of a reasonable professional by *choosing* to impeach Officer Lindsey to the degree he did." (Emphasis added.) The trial court specifically found:

27

17.    [Defense counsel] did not elicit the number of DWI trials in which Lindsey testified or the amount of overtime pay that he received the previous year (or during his tenure on the DWI Task Force) and did not argue that he lacked credibility because he was motivated to make DWI arrests to enrich himself and his colleagues.

18.    Lindsey's payroll records from 1992-2004 reflect that his overtime pay exceeded his regular pay; that his overtime pay encompassed more than 50 percent of his earnings in nine of those 13 years; and that, during the first 11 months of 2004, he made $63,924 in regular pay and $82,032 in overtime pay . . . .

19.    Lindsey's HPD personnel file reflects he was suspended for 15 days in 1990 for submitting four requests for overtime that he did not work and for forging a prosecutor's signature on an overtime form in a DWI case . . . .

. . . .

27.    It was the opinion among the lawyers in Harris County who regularly handled DWI cases during Lindsey's tenure on the DWI Task Force that he arrested many people for DWI in affluent parts of southwest Houston—regardless of how well they performed the field sobriety tests or how sober they appeared to be on videotape—so he could obtain overtime pay for appearing in court pursuant to subpoena to testify at their trials . . . .

28.    Some criminal defense lawyers would obtain Lindsey's HPD payroll records pursuant to the Public Information Act before they tried DWI cases in which he would testify and would impeach him with the amount of overtime pay he received to demonstrate his financial motive for making DWI arrests. They typically would argue that he arrested sober drivers for DWI because he knew that they would go to trial, so he would receive overtime pay for appearing in court to testify; that, for this reason, he gave no driver the benefit of the doubt at the scene; that, in effect, he received three days of pay for appearing at a two-day trial; that he received payment even if the defendant were acquitted; and that his overtime pay exceeded his regular pay during his tenure on the DWI Task Force; [and]

29.    Some criminal defense lawyers trying a DWI case in which Lindsey was a key prosecution witness in 2005 would have obtained his HPD payroll and disciplinary records; elicited on cross-examination the amount of overtime pay he had received; and argued that his opinion that the driver was intoxicated was not credible because he had a financial motive to make the arrest.

Critically, the trial court further found that trial counsel "did not have Lindsey's HPD payroll or disciplinary records at the time of [appellant's] trial" and "the amount of overtime pay that Lindsey had received was admissible to show his financial interest and motive for making DWI arrests . . . ."[6] It further found that "[h]ad [trial counsel] elicited the amount of overtime pay that Lindsey had received for testifying in DWI cases, he could have argued that Lindsey arrested [appellant] so he and his fellow DWI Task Force officers could receive overtime pay for testifying."

Given the trial court's specific findings, by which we are bound, we must conclude that it was not reasonable for trial counsel to decide not to impeach

[6]    On remand, the State, citing Texas Rule of Evidence 608(b), asserts that Officer Lindsey's overtime record would have been inadmissible and, thus, appellant was not prejudiced "by trial counsel's failure to use a document that he testified he would not have used and that the rules of evidence deem inadmissible." A party may not use specific instances of a witness's conduct to attack or support the witness's "character" for truthfulness. TEX. R. EVID. 608(b). However, the State has not demonstrated that rule 608(b) precludes the admission of evidence that demonstrates the bias and prejudice of a witness. *See id.* 613(b) (allowing evidence of specific instances of conduct to show possible bias or prejudice); *Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009) (quoting *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974)) (noting distinction between attack on witness's general credibility and "more particular attack on credibility" to show possible bias or prejudice).

Officer Lindsey's testimony and argue that he lacked credibility or had an improper motive to arrest appellant without actually investigating Lindsey's well-known overtime-pay abuse by obtaining his payroll records. The resolution of the ultimate question presented to us does not turn on an evaluation of trial counsel's credibility or demeanor. *See Ex parte Peterson*, 117 S.W.3d at 819. An investigation that did not include obtaining the payroll records, which were available and readily detailed the vast extent of Lindsey's overtime-pay abuse, does not reflect reasonable professional judgment. *See Wiggins*, 539 U.S. at 534, 123 S. Ct. at 2541–42. The fact that the scene video was "good" for appellant did not put trial counsel in the position of having to choose between focusing on the video or Lindsey's credibility. Accordingly, we hold that trial counsel's performance was deficient. *See Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066.

To prevail on his claim of ineffective assistance, appellant not only must show deficient performance by trial counsel but also, beyond a reasonable probability, that, but for counsel's deficient performance, a different result would have occurred. *Thompson*, 9 S.W.3d at 812. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Hernandez v. State*, 726 S.W.3d 53, 55 (Tex. Crim. App. 1986)).

As the trial court found, the HPD video recording of appellant "alone does not establish that [appellant] had lost the normal use of his physical and mental

30

faculties as a result of intoxication" and, thus, "the State relied substantially on [Officer] Lindsey's opinion regarding intoxication" and his "opinion that [appellant] was intoxicated to convict him." Lindsey was the only officer who formed, and testified to, an opinion that appellant was intoxicated at the time of his arrest. The trial court did find that trial counsel provided the jury with "the inference that Officer Lindsey was financially motivated to make arrests." However, it further found that trial counsel "could have argued that Lindsey arrested [appellant] so he and his fellow DWI Task Force officers could receive overtime pay for testifying" if trial counsel had "elicited the amount of overtime pay that Lindsey had received for testifying in DWI cases." As the trial court findings readily demonstrate, trial counsel could have used Lindsey's payroll records to provide more than an inference of Lindsey's financial motive in arresting appellant. He could have provided direct evidence that Lindsey actually engaged in overtime-pay abuse and argued that this evidence demonstrated Lindsey's bias and prejudice in his testimony against appellant. Because the HPD video recording alone does not establish that appellant was intoxicated at the time he was stopped by Lindsey, and the State substantially relied on Lindsey's opinion regarding intoxication, his credibility was crucial to conviction. Thus, direct evidence of Lindsey's overtime-pay abuse in DWI cases could have significantly affected the outcome of the case.

We hold that there is a reasonable probability, sufficient to undermine confidence in the outcome of the case, that but for the deficient performance of trial counsel, the result of the proceeding would have been different. Accordingly, we further hold that the trial court abused its discretion in denying appellant's application for a writ of habeas corpus.

We sustain appellant's second issue.[7]

### Conclusion

We reverse the order of the trial court denying appellant's application for a writ of habeas corpus, and we grant him habeas corpus relief. We set aside the judgment of conviction, signed on January 11, 2005, in cause number 1260469 in County Criminal Court at Law No. 2 of Harris County. We remand the cause for further proceedings consistent with this opinion.

Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Lloyd.

---

[7] Appellant also contends that the trial court erred in denying his application because counsel rendered ineffective assistance by failing to (1) present evidence that jet skiing does not require physical dexterity and (2) use appellant's medical records to corroborate Officer Lindsey's testimony that appellant stated that he had previously injured his ankle and knee. Because we conclude that trial counsel's performance was deficient and harmful based on his failure to investigate Officer Lindsey's overtime-pay abuse, we need not address these contentions.

Publish. TEX. R. APP. P. 47.2(b).