**EX PARTE Richard Mark BOWMAN, Appellant**

**NO. PD-0208-16**

Court of Criminal Appeals of Texas.

DELIVERED: June 28, 2017

Rehearing Overruled August 23, 2017

curring Opinion at 331–32, then the Court ought to overrule *Brister*.

Randy Schaffer, Houston, TX, for appellant.

Bridget Holloway, Assistant District Attorney, Houston, TX, Stacey Soule, Austin, TX, for The State.

## OPINION

Yeary, J., delivered the opinion of the Court in which Keller, P.J., and Keasler, Hervey, Keel and Walker, JJ., joined.

Appellant was arrested for the misdemeanor offense of driving while intoxicated ("DWI") on September 24, 2004. In a jury trial, he was convicted of that offense on January 11, 2005. His punishment was assessed at 180 days in county jail, probated for a period of one year, and an $800 fine. Although he originally intended to appeal his conviction, Appellant filed a motion to dismiss the appeal, which was granted on January 6, 2006. On September 27, 2013—more than seven and a half years after his conviction became final by the dismissal of his appeal—Appellant filed a post-conviction application for writ of habeas corpus under Article 11.072 of the Code of Criminal Procedure, alleging that his trial counsel's representation had been constitution-

ally deficient to his substantial detriment. Tex. Code Crim. Proc. art. 11.072.

The convicting court conducted a hearing on the writ application and ultimately denied relief.[1] On appeal,[2] however, the First Court of Appeals reversed, concluding that counsel had performed deficiently and that Appellant had suffered prejudice. *Ex parte Bowman*, 444 S.W.3d 272, 282 (Tex. App.—Houston [1st Dist.] 2014). The court of appeals rejected the State's attempt to rely on the equitable doctrine of laches to bar habeas corpus relief on the ground that the State had not invoked laches during the writ hearing at the convicting court level. *Id.* at 279. On the State's petition for discretionary review, however, this Court vacated the judgment of the court of appeals and remanded the cause for further proceedings, holding that the State did not forfeit its laches argument by failing to raise it first in the convicting court. *Ex parte Bowman*, 447 S.W.3d 887, 888 (Tex. Crim. App. 2014).

The court of appeals remanded the cause, in turn, to the convicting court for further factual development in a hearing on the laches issue. *Ex parte Bowman*, 483 S.W.3d 726, 731 (Tex. App.—Houston [1st Dist.] 2016). After conducting the hearing, the convicting court concluded that Appellant should be barred by laches from obtaining habeas corpus relief. The court of appeals reversed the convicting court again, however, holding that laches did not bar Appellant from pursuing his ineffective assistance of counsel claim, and once again granting Appellant relief on that claim. *Id.* at 738, 741. We granted the State's second

petition for discretionary review with respect to two issues: 1) Did the court of appeals err to reach the merits of Appellant's habeas claim when he waited over seven and a half years to assert it; and, if not, then, 2) in any event, did the court of appeals err to hold that Appellant established ineffective assistance of counsel at his 2005 trial for DWI. Because we hold that the court of appeals erred to find trial counsel ineffective, we need not address the laches issue.

## BACKGROUND

### The Offense

After jet-skiing in the afternoon with one friend, and then drinking at least one glass of wine at the apartment of another friend before briefly falling asleep on her couch, Appellant drove home in the early morning hours of September 24, 2004. Officer William H. Lindsey of the Houston Police Department clocked Appellant driving sixty miles per hour in a thirty-five mile per hour speed zone and pulled him over into the parking lot of a gentlemen's club. Lindsey observed no other infractions of the law before stopping Appellant. Once he did stop Appellant, however, Lindsey detected the odor of alcohol on his breath. He therefore asked Appellant to submit to field sobriety testing. At first, Appellant refused to do any of the field sobriety tests, claiming that he had prior injuries to his knee and ankle. But when Lindsey placed him in handcuffs, Appellant agreed to undergo the testing. Lind-

---

1. The judge who presided over the trial was different than the judge who later presided over the habeas proceedings.

2. Unlike post-conviction applications for writ of habeas corpus from final felony convictions under Article 11.07 of the Texas Code of Criminal Procedure, which are returnable to this Court, Tex. Code Crim. Proc. art. 11.07

§ 3(a), applications for writ of habeas corpus in cases involving judgments ordering community supervision under Article 11.072 are resolved by the convicting court, subject to direct appeal and discretionary review of the appellate court decision. Tex. Code Crim. Proc. art. 11.072 § 8.

sey then uncuffed Appellant and began administering the horizontal gaze nystagmus test. From that test, Lindsey perceived six signs of intoxication. Lindsey next asked Appellant to perform the leg-lift test, but Appellant was unable to do it. He did, however, perform the heel-to-toe test, after which Lindsey arrested him for driving while intoxicated. The sobriety testing and subsequent arrest were recorded on Lindsey's dash camera. Down at the station house, Appellant refused to submit to a breathalyzer test or further physical sobriety testing. He was later charged with misdemeanor DWI.

### The Trial

In December of 2004, Appellant replaced his originally retained attorney with new counsel, Ned Barnett. The trial judge made it clear to Barnett, however, that he would be expected to go forward on the original trial date set for January 11, 2005. In a jury trial on that date, Lindsey testified against Appellant as summarized above, and the video of Appellant's field sobriety testing was admitted into evidence. In addition, Officer Raymond Cibulski testified that, once Appellant arrived at the station house, he refused to submit a sample of his breath for blood-alcohol analysis. Though Cibulski smelled "a strong odor of an alcoholic beverage on [Appellant's] breath," saw his "red bloodshot eyes," and heard his "slurred speech," he was unwilling to state an opinion about whether Appellant was intoxicated. Officer Chris Green gave Appellant another "opportunity to perform motor skill exercises[,]" but Appellant "refused them all." Like Cibulski, Green perceived "a strong odor of alcoholic beverage on [Appellant's] breath and red, glassy eyes." But he was also unwilling to offer the opinion that Appellant had necessarily been intoxicated. Lindsey had no such reluctance, confidently asserting at several points during trial that it was his opinion that Appellant had lost the normal use of his physical and mental faculties because of alcohol intoxication.

On cross-examination of Lindsey, Barnett established that, for eighteen years, Lindsey's duties as a Houston police officer had "focus[ed]" on DWI investigations, most recently as a member of a "D.W.I. task force[.]" Lindsey testified that both Cibulski and Green were also members of the DWI task force. Lindsey acknowledged that he is off duty when he testifies in court, for which he gets "paid overtime, time and a half." He testified that during the previous year he had made four hundred and seventy-six arrests for driving while intoxicated:

Q. So, whenever you make an arrest and you go to court in your off time, you're getting time and a half?

A. I'm required to be here by law, yes, sir.

Q. And that is part of your job description?

A. You're a police officer, you're expected to either—it's part of your job. I don't see how you can be a police officer and not make an arrest or not write tickets if you're in the street, that's correct.

Q. Testifying is part of your job description?

A. If you make arrests, yes, sir, it comes with the territory.

Q. You make a lot of D.W.I. arrests, don't you?

A. It's what I do solely, yes, sir.

Q. Do you have an estimate of how many D.W.I. arrests you make in a month?

A. No, because each month is different. You have cold weather months, not too many people go out during the cold

weather, hot rainy months, rainy weather. On average, well, I can give you—last year, I can give you a number, I know the total number of arrests I made for the year is four hundred and seventy-six, myself, for the year.

Q. Four hundred and seventy-six in a twelve month period?

A. That's correct.

From this juncture, Barnett turned to questioning Lindsey specifically about his stop of Appellant. Later, during his final summation to the jury, Barnett made no mention of the above testimony.

## THE ARTICLE 11.072 WRIT APPLICATION

### The Pleading

A year after he was convicted, Appellant's appeal was dismissed at his own behest, and his 2005 conviction for DWI became final. More than seven years later, in April of 2013, Appellant was again charged by information with misdemeanor DWI. His 2005 DWI conviction was also alleged, as a prior conviction, to enhance the 2013 DWI offense from a Class B misdemeanor, with a minimum term of confinement of 72 hours, *see* TEX. PENAL CODE § 49.04(b), to a Class A misdemeanor, with a minimum term of confinement of 30 days, *see* TEX. PENAL CODE § 49.09(a).[3]

Appellant responded by filing an application for writ of habeas corpus under Article 11.072, challenging the 2005 DWI conviction. TEX. CODE CRIM. PROC. art. 11.072. In his application Appellant alleged, among other things, that Barnett rendered ineffective assistance of counsel during his 2005 trial by failing vigorously

enough to develop and present evidence of a pattern on the arresting officer's part of making unwarranted DWI arrests in order to earn overtime pay.

At the outset of the hearing on the writ application, Appellant introduced a number of exhibits to substantiate this claim. The State made no objection. These exhibits include a letter from the Houston Police Department, generated in response to Appellant's request under the Texas Public Information Act, which shows that in the years 1992 through 2004, inclusive, Lindsey earned more in combined overtime pay than he earned in combined regular salary. In nine of those thirteen individual years, Lindsey earned more in overtime pay than in regular salary. And in the first eleven months of 2004—the year of Appellant's first DWI arrest—Lindsey earned a total of $145,957, of which only $63,924 was regular salary while $82,032 was paid overtime.[4]

In other exhibits that were admitted at the hearing without objection, three criminal defense lawyers from Harris County, who asserted that they have tried "many" DWI cases there, claimed as follows (as exemplified by the affidavit of Doug Murphy, who described himself as "specializing" in DWI cases):

It is common knowledge among lawyers in Harris County who regularly handle DWI cases during Lindsey's tenure on the DWI Task Force that he arrested many people in affluent parts of southwest Houston—regardless of how well they performed the field sobriety tests or how sober they appeared to be on videotape—so he could obtain

---

**3.** The court of appeals characterized this mistakenly as "a jurisdictional enhancement." *Bowman*, 444 S.W.3d at 276.

**4.** Another exhibit was a copy of a newspaper article from the Houston Chronicle, dated April 23, 2006, asserting that Lindsey earned more than $100,000 in overtime pay in 2005. Because Appellant's trial occurred in January of 2005, however, Barnett cannot have been expected to be aware of this information.

overtime pay for appearing in court pursuant to a subpoena to testify at their trials. Competent defense lawyers made Public Information Act requests to HPD to obtain Lindsey's payroll records before they tried DWI cases in which he would testify.

\* \* \*

Defense lawyers would present this evidence on cross-examination to demonstrate Lindsey's motive for making the arrest. They typically would argue that Lindsey arrested sober drivers for DWI because he knew that they would go to trial and he would receive overtime pay for appearing in court to testify; that, for this reason, he gave no driver the benefit of the doubt at the scene; that, in effect, he received three days of pay for appearing at a two-day trial; that he received the money even if the defendant were acquitted; and that his overtime pay exceeded his regular pay during his tenure on the task force. Arguments of this nature frequently persuaded juries to reject Lindsey's opinion regarding intoxication.

I believe that a reasonably competent criminal defense lawyer trying a DWI case in which Lindsey was a key prosecution witness in 2005 would have obtained his payroll records; elicited on cross-examination the amount of money he had received in overtime pay; and argued that his opinion that the driver was intoxicated was not credible because he had a financial motive to make the arrest. Eliciting only the number of DWI arrests that Lindsey made during the previous year and that he was paid time-and-a-half for overtime when he testified would not have given the jury sufficient information to fully assess his financial motivations.

The other two attorneys' affidavits set out essentially the same information.

In addition, Appellant introduced an affidavit from the trial judge from Appellant's 2005 DWI trial, former Judge Michael Allen Peters. Appellant's habeas counsel posed the following hypothetical question to Judge Peters: Would he have allowed defense counsel at the 2005 trial to question Lindsey "as to what amount of compensation he, in fact, receives for testifying in a court wherein the trial or hearing involves one of his arrestees, and what would be the amount of overtime compensation both for the specific case (Bowman) as well as for the year[?]" Judge Peters responded:

In all probability I would have allowed the witness to answer that question (if it was asked with the proper predicate) as it would seem to show the jury or allow the jury to determine a possible motive behind the arrests of 476 persons including Mr. Bowman. The jury might conclude that ... Officer Lindsey had a financial interest, bias, perhaps a monetary influence for his part of the testimony given in a trial or hearing. \* \* \* Moreover, this issue is familiar to me from other cases involving Officer Lindsey, both in my court and other courts, wherein Officer Lindsey had testified regarding the relevance to the trier of fact of this matter.

Appellant contended that his trial counsel, Barnett, was ineffective for not developing and presenting such evidence of Lindsey's self-interest.

### The Writ Hearing

Barnett was the only witness to testify at the writ hearing. Over and over, he professed not to be able to remember whether he had obtained Lindsey's overtime pay records in preparation for Appellant's 2005 trial:

Q. I want to talk to you, first of all, about your cross-examination of Officer

Lindsey. What did you know about him when you tried the case?

A. As I sit here right now, I don't know a—how—at some point I learned a lot about Officer Lindsey as everybody did. I don't know what information I had at that point here eight or nine years later.

\* \* \*

Q. Did you know that he was the highest paid officer in the city based on the way he worked the overtime system?

A. At some point I knew that. I don't know if I knew that at the time this case was tried.

Q. Well, did you obtain Officer Lindsey's payroll records to determine what he was doing with regard to his overtime pay at the time you tried the case?

A. As I sit here now, I don't, I don't know if I had them at that time.

Q. All right. But at the time you tried the case were you aware of Officer Lindsey's reputation for arresting everybody he stopped for DWI to collect overtime pay for himself and his fellow Task Force officers?

A. I, I knew all these officers did that.

Q. Okay. Did you believe it would be important to obtain the records regarding his overtime pay during that period of time?

A. Well, it could be. I think we talked about that quite a bit in this case.

Q. So the question is: Did you have his overtime pay records or not when you tried the case?

A. Oh, yeah. I don't know the answer to that.

\* \* \*

Q. Did you know how to obtain an officer's overtime payroll records back at the time you tried this case?

A. I'm sure I did at that time.

Q. How?

A. With an Open Records Request.

Q. To whom?

A. City of Houston.

Q. Was it pretty easy to get?

A. Open Records, yes, sir.

Q. Had you ever done it?

A. I'm sure I have. Well, let me back up.

Q. Sure.

A. I don't know if at that time I might have.

\* \* \*

Q. So my question to you is: Did you obtain those payroll records to be used in [Appellant's] trial?

A. I don't know the answer to that question as I sit here today.

Q. Is there any reason you wouldn't obtain an officer's payroll records in any Task Force case that was going to trial?

A. Well, in looking back at that point in time I just don't know if I did. I don't have any particular reason as I sit here now.

\* \* \*

Q. You can't even be sure as you sit here today that you knew how much overtime he made, correct?

A. That's correct.

Q. Because you can't be sure you had his records, correct?

A. That's correct.

He also repeatedly insisted that, had he obtained those records prior to trial, he would not have chosen to use them to impeach Lindsey.

Barnett believed that he could potentially use the dash-cam video to generate a reasonable doubt in a juror's mind with respect to Appellant's level of intoxication. He viewed the case as a "triable" one, and he explained that he did not want to shift

the jury's focus from the video to Lindsey's potential motive. But he also wanted to raise at least the specter of financial motive, which is why he began his cross-examination of Lindsey by asking about the number of arrests he made as a member of the DWI task force and the fact that he was paid time-and-a-half for testifying:

Q. And you elicited [at trial] that he was paid time and a half for overtime when he testifies, correct?

A. Yes, sir.

Q. And you elicited he made 476 arrests during the previous year, correct?

A. Yes, sir.

Q. Why did you elicit that testimony?

A. That's an area that I go into in almost every case. I wanted the jury to have an idea of—

Q. Of what?

A. —of what Mr. Lindsey did.

Q. What do you mean of what he did?

A. Well, that he, that he, that he made DWI arrests.

Q. Well, by itself, that would just indicate he was a very busy, very successful officer, wouldn't it?

A. Um, well, I think the jury would do whatever they want with it.

\* \* \*

Q. Well, did you want the jury to get a complete picture of his financial incentive to make DWI arrests?

A. I wanted the jury to know what he did. I wanted the jury to have an idea about it but I didn't want to focus on it. I did not want to put him on trial because the case was almost exclusively on video.

\* \* \*

Q. Now, during summation you did not argue that Officer Lindsey's opinion lacked credibility because he was motivated to make DWI arrests for financial gain. Why didn't you make that argument?

A. I didn't think Lindsey's opinion— I mean, I know you say he was the only one that said he was intoxicated. The jury saw everything that Officer Lindsey saw, and I wanted the jury to focus on the video.

\* \* \*

Q. Wasn't the whole point of eliciting that Officer Lindsey made a lot of DWI arrests and receiving overtime pay to show he had a financial motive to make arrests for personal financial gain? Wasn't that the reason you went into it?

A. I wanted the jury to have an idea about it, yes, sir.

Q. Why didn't you close the deal during argument in making that point?

A. Well, I didn't want them to focus on Officer Lindsey.

Q. Why not?

A. I didn't want to draw focus away from the other facts of the case.

Q. So you don't think Officer Lindsey's motive to arrest [Appellant] so he could get paid extra money for him and his friends to come to court was a reason the jury could have discounted his opinion?

A. That would be a different strategy. That's not the strategy that I went with.

Q. So did you think it would have been a good strategy to elicit Officer Lindsey's financial incentive to make DWI arrests?

A. Well, I touched—I did more than touched on it and I thought I went far enough with it.

\* \* \*

Q. If you had had Officer Lindsey's overtime pay records ... at the time of trial, would you have used that information on cross-examination?

A. I don't know if I would have taken it any further than I have with the facts of this case.

Q. So even if you had the records you wouldn't have used them is what you're telling us?

A. I just—I would have to go back in time that far. I just couldn't answer the question as I sit here right now.

Q. Well, you know, I kind of need you to do that because this is where the rubber meets the road. I'm trying to figure out if you had a sound strategy not to use records that you probably didn't know about. So if you had the records in your hand, knew the information contained in them, would you have elicited that information from Officer Lindsey or at least tried to do so?

A. In this case, I must say I probably would not have.

Q. And is that because you thought the video was good and wanted the jury to focus on the video rather than Officer Lindsey?

A. Well, I elicited enough information regarding his overtime. I didn't want the jury to—I didn't think we needed it. I did not want to risk getting the jury angry with me for beating up on Lindsey on something that might be unrelated and I wanted them to focus— * * * I wanted them to focus on the good portions of the video. * * * I think if you take it too far that sometimes a jury feels sorry for the officer.

* * *

Q. All right. Was [the video] so good that you didn't need to impeach the officer with evidence of his financial motivation to make the arrest?

A. I don't know that. I think it was the type of video that I didn't need to do that with.

Q. Why couldn't you do both? Why couldn't you focus on the video and bring out the fact that the guy had an overtime pay scam going on in DWI cases? Were they mutually exclusive?

A. Not necessarily.

Q. You could have done both, could you not?

A. I could have, yes.

Q. If you had been thorough about it, you would have done both, would you not?

A. Well, I don't necessarily agree with that.

Q. If you didn't have his overtime pay records you couldn't have made a reasonable strategic decision not to use the information, could you?

A. That's correct.

* * *

Q. Is it your strategy in every case not to impeach prosecution witnesses with evidence of motive?

A. No.

Q. But that was your strategy in this case, correct?

A. With going further? Well, again, one, I don't know if I had those records at the time here, eight years later. And, two, with the facts of this case, I don't think I would have gone any further with it.

* * *

Q. What argument could you have made to the jury about Officer Lindsey's credibility if you had elicited that information?

A. I would have said that he wanted to get, he wanted to make the arrest so he could come into court and make more money testifying.

Q. As demonstrated by the fact that he had doubled his income over the past thirteen years by doing exactly that?

A. Exactly.

Q. You think that's an argument that could have been persuasive to a jury in creating reasonable doubt?

A. I think that's a strategy that—a different strategy, and I understand, and that strategy makes sense.

Q. Why didn't you argue that Officer Lindsey arrested [Appellant] so he could receive overtime pay for appearing in court to testify?

A. I didn't—that's not what I wanted to base my strategy on at that point. I brought it out and I wanted to focus on the fact that [Appellant] didn't appear intoxicated. That there was a reasonable doubt about him appearing intoxicated. If it was a case where he looked horrible on the video, I would have definitely wanted to do that.

On cross-examination by the prosecutor, Barnett confirmed that it had been his strategy, "in essence, to not go forward . . . impeaching Lindsey with records, even if [he] had them, because [he] wanted to appear to focus on the video, which was the crux of the case."

### Findings of Fact and Conclusions of Law

The convicting court entered written findings of fact and conclusions of law that were largely drawn from Appellant's proposed findings and conclusions. Nevertheless, the convicting court ultimately denied relief, concluding that "Barnett's representation was well within the range of reasonable professional assistance and [Appellant] cannot show that but for the alleged failings of the defense counsel, the result would have been different." Along the way, the convicting court made the following findings of fact:

- At Appellant's trial, only Lindsey testified that, in his opinion, Appellant was intoxicated. The dash-cam video did not by itself establish Appellant's intoxication, so the State relied "substantially" on Lindsey's opinion to convict.

- While cross-examining Lindsey, Barnett elicited the facts that Lindsey gets paid time-and-a-half overtime for testifying in court and that he had made 476 DWI arrests the previous year.

- Barnett did *not* "elicit the number of DWI trials in which Lindsey testified or the amount of overtime pay that he received the previous year (or during his tenure on the DWI Task Force) and did not argue that he lacked credibility because he was motivated to make DWI arrests to enrich himself and his colleagues."

- "Lindsey's payroll records from 1992-2004 reflect that his overtime pay exceeded his regular pay; that his overtime pay encompassed more than 50 percent of his earnings in nine of those 13 years; and that, during the first 11 months of 2004, he made $63,924 in regular pay and $82,032 in overtime pay."

- Barnett did *not* have Lindsey's payroll records at the time of Appellant's 2005 DWI trial.

- "The amount of overtime pay that Lindsey had received was admissible to show his financial interest and motive for making DWI arrests."

- "It was the opinion among the lawyers in Harris County who regularly handled DWI cases during Lindsey's tenure on the DWI Task Force" that he would arrest many people in affluent areas of town, regardless of how well they performed on sobriety

tests or how sober they appeared, simply so that he would be called to testify in court and earn overtime pay. "Some criminal defense lawyers" would obtain Lindsey's overtime pay records through the Public Information Act. "They typically would argue that he arrested sober drivers for DWI because he knew that they would go to trial, so he would receive overtime pay for appearing in court to testify; that, for this reason, he gave no driver the benefit of the doubt at the scene[.]"

- "Had Barnett elicited the amount of overtime pay that Lindsey ·had received for testifying in DWI cases, he could have argued that Lindsey arrested [Appellant] so he and his fellow DWI Task Force officers could receive overtime pay for testifying.

Nevertheless:

- "Eliciting only the number of DWI arrests that Lindsey made during the previous year and that he was paid time-and-a-half for overtime when he appeared in court to testify did give the jury sufficient information to assess his financial motivation."

- "Barnett did provide to the jury the inference that Officer Lindsey was financially motivated to make arrests. Barnett acted within ... the accepted legal practice of a reasonable professional by choosing to impeach Officer Lindsey to the degree he did. Barnett testified he wanted the jury to focus on the video and [he did] not [want to] appear to be beating up on an officer. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client the same way."

The convicting court essentially concluded that Barnett made a professionally acceptable decision not to use Lindsey's overtime pay records in his attempt to suggest to the jury that he had a financial motive to testify. The convicting court made no finding of fact or conclusion of law, however, touching on whether it was professionally reasonable for Barnett to make such a strategy decision without first exploring his options by obtaining Lindsey's records via an Public Information Act request.

### The Appeal and Discretionary Review

Appellant argued on appeal that the convicting court's deference to trial counsel's strategy decision was inappropriate because that strategy decision had been based upon an inadequate investigation. Trial counsel could not legitimately choose to raise a question about the arresting officer's financial motivation to testify, but then soft sell it for strategic reasons, without first conducting an investigation adequate to reveal exactly how compelling a case he could have made. The court of appeals agreed. *Bowman*, 444 S.W.3d at 281. The court of appeals noted that the convicting court had found as a matter of fact both 1) that trial counsel had endeavored to expose the arresting officer's financial motive, and 2) that he had failed to obtain the officer's payroll records. So long as trial counsel chose to broach the subject of the officer's financial motive, the court of appeals explained, he could not invoke "strategy" as an excuse not to conduct an adequate investigation into that financial motive. *Id.* According to the court of appeals, "[a]n investigation that did not include obtaining the payroll records, which were available and readily detailed the vast extent of [the arresting officer's] overtime-pay abuse, does not reflect reasonable professional judgment." *Id.* (citing *Wiggins*

*v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)).

Moreover, the court of appeals explained, "[t]he fact that the scene video was 'good' for appellant did not put trial counsel in the position of having to choose between focusing on the video or Lindsey's credibility." *Id.* The fact that Appellant may not have looked particularly inebriated in the dash-cam video could readily have dove-tailed with a jury argument that Lindsey had arrested him, not because he genuinely believed Appellant was intoxicated, but simply in order to be summoned to trial and once again earn time-and-a-half overtime pay. Barnett's performance was deficient, the court of appeals concluded, because he did not adequately investigate the potential for pursuing such a two-pronged defense. *Id.* Because the arresting

officer's testimony that Appellant was intoxicated "was crucial to conviction[,]" the court of appeals also concluded that Appellant was prejudiced by trial counsel's deficiency. *Id.* at 282.[5]

## INEFFECTIVE ASSISTANCE OF COUNSEL

### The Standard

 In order to prevail on a Sixth Amendment claim of ineffective assistance of counsel, a habeas applicant must show, by a preponderance of the evidence, that "counsel's performance was deficient." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011).[6] The applicant must

**5.** The State argued that Appellant's claim should be barred by laches because he waited more than seven years to file his 11.072 writ application—and then he only did so because the 2005 DWI conviction was alleged to enhance the charge against him in a subsequent DWI prosecution. The court of appeals rejected this argument because it had not been litigated in the convicting court. *Id.* at 278-79. The court of appeals drew a distinction between writ applications brought under Article 11.07 of the Code of Criminal Procedure, and those brought pursuant to Article 11.072. In the former, the convicting court only makes recommended findings of fact; the Court of Criminal Appeals is the "ultimate finder of fact." *Id.* at 278. But in the latter, the convicting court is the sole finder of fact, and appellate courts must give those findings deference. *Id.* (citing *Ex parte Garcia*, 353 S.W.3d 785, 787-88 (Tex. Crim. App. 2011)). For the court of appeals to address the laches issue in the first instance, the court of appeals concluded, "would require [the court of appeals] to determine a fact issue." *Id.* at 279. Because it was not the court of appeals' function to act as a fact-finder in the Article 11.072 context, the court of appeals declined to take up the laches issue for the first time on appeal.

On discretionary review, this Court agreed that it would not have been appropriate for the court of appeals to assume the role of fact-finder. *Bowman*, 447 S.W.3d at 888. But that

did not mean, we held, that the State could not raise the laches issue for the first time on appeal. *Id.* Shortly after the court of appeals' opinion issued in *Bowman*, 444 S.W.3d at 272, this Court decided *Ex parte Smith*, 444 S.W.3d 661, 663 (Tex. Crim. App. 2014), in which we held that a court may take up the issue of laches *sua sponte*. Accordingly, we remanded this cause to the court of appeals for "proceedings consistent with this opinion." *Bowman*, 447 S.W.3d at 889. The court of appeals, in turn, remanded the cause to the convicting court for further proceedings with respect to the State's assertion that Appellant's ineffective assistance of counsel claim was barred by laches. *Bowman*, 483 S.W.3d at 728, 731. After conducting a laches hearing, the convicting court concluded that Applicant's ineffective assistance of counsel claim was barred by laches. The court of appeals disagreed, and once again granted habeas corpus relief. *Bowman*, 483 S.W.3d at 732, 738-42. Because we now conclude that the court of appeals erred to grant relief on the merits, we need not address the propriety of its ruling with respect to laches.

**6.** An applicant must also demonstrate that counsel's deficiency prejudiced his defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Because we resolve Appellant's claim based on the deficiency prong, we need not greatly

show that counsel's performance failed to satisfy an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. A reviewing court must assess reasonableness under the circumstances of the particular case "viewed as of the time of counsel's conduct." *Id.* at 688, 690, 104 S.Ct. 2052. Isolated errors or omissions of counsel do not amount to deficient performance, which is judged by the totality of the representation. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). Constitutionally competent legal representation is not a static thing: "[t]here are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. "[C]ounsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.* at 690, 104 S.Ct. 2052. The presumption is that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* An applicant who cannot overcome this presumption by a preponderance of the evidence will not succeed in his Sixth Amendment claim. *See id.* at 697, 104 S.Ct. 2052 ("[T]here is no reason for a court deciding an ineffective assistance claim ... to address both (the deficiency prong and prejudice prong of the *Strickland* standard) if the defendant makes an insufficient showing on one.").

 The habeas applicant must identify with particularity "the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052. The deficiency alleged in this case is the same as that in *Strickland* itself: counsel failed to adequately investigate the facts of the case in preparation for trial. An advocate's strategic decisions must be

informed by a reasonable preliminary investigation. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 539 U.S. 510, 521-22, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052.

### ANALYSIS

#### Failure to Investigate

 In his writ application, Appellant argued, and the court of appeals agreed, that Barnett did not conduct an adequate preliminary investigation to inform his decision to forego impeaching Officer Lindsey with his payroll records. *Bowman*, 483 S.W.3d at 740-41. We need not address this contention, however, because we conclude there is no record support for the premise. The record does not bear out the convicting court's finding that Barnett failed to obtain and review those records to begin with.

At no point did Barnett concede that he failed to obtain Lindsey's payroll records prior to Appellant's 2005 DWI trial. The trial court made a fact finding that Barnett did *not* have those payroll records, but there is no evidentiary support for that finding. All Barnett ever conceded at the writ hearing was that he could not presently remember whether he had obtained those records. Several times he insisted

elaborate on the standard for proving prejudice.

that, because of the passage of time, he did not know, and could not say, whether he had obtained Lindsey's records before Appellant's trial. Even if the convicting court found Barnett's memory deficit incredible, that would not provide positive evidence that Barnett failed to obtain the records. In the absence of evidence to show—one way or the other—whether Barnett had obtained the records, Appellant cannot overcome the *Strickland* presumption of adequate investigative assistance. He has failed to establish by a preponderance of the evidence the factual premise of his claim—that Barnett failed to conduct a preliminary investigation that was sufficient to inform his decision not to impeach Lindsey more stoutly than he chose to do at trial.[7]

### Other Instances of Alleged Attorney Deficiency

■ On direct appeal, Appellant asserted two other instances of ineffective performance by trial counsel. The court of appeals did not address those claims, having found Appellant's first claim of attorney deficiency sufficient to establish prejudice. *Ex parte Bowman*, 483 S.W.3d at 741 n.7. We do not ordinarily address issues that were not decided by the court of appeals; we will sometimes do so, however, in the interest of judicial economy, if the proper resolution of those issues is clear. *Gilley v. State*, 418 S.W.3d 114, 119-20 (Tex. Crim. App. 2014). Here, we think the remaining claims are clearly meritless, and

we see no good reason once again to remand the cause.

### 1. Jet Skiing

■ Appellant argued that trial counsel should have presented some testimony—or, failing that, a demonstrative photograph—to prove to the jury that jet skiing is not a particularly arduous activity. During the video of Appellant's field sobriety testing in front of Lindsey's patrol car, which was admitted at trial, he told Officer Lindsey that he had injured his right ankle and left knee two years before in a jet ski accident. Subsequently, Appellant was unable to perform the leg-lift test. During his opening statement to the jury, Barnett stated that Appellant told Lindsey he was unable to perform this particular test because of the previous injuries.[8] And yet the jury was aware that Appellant had been jet skiing the afternoon before his arrest. Appellant now faults trial counsel for failing to present some evidence that, unlike the field sobriety test he claimed he could not perform, jet skiing does not require any particular "physical dexterity." Appellant suggests that counsel could have offered witness testimony to this effect, or a still photograph of someone in the act of riding a jet ski (such as a photograph he offered as "demonstrative" evidence at the writ hearing).

Barnett testified at the writ hearing that he would not have wanted to present such

7. This case well illustrates that the adverse impact upon witness memory that inevitably results from a delay in raising post-conviction challenges may disadvantage a habeas applicant's ability to satisfy his burden of proof as much as or more than it disadvantages the State's ability to respond—the flip side of the laches issue.

8. When Lindsey demonstrated the leg-lift test and asked Appellant whether he had any

questions, Appellant reminded Lindsey that he had earlier mentioned these prior injuries. Lindsey in turn reminded Appellant that he had told Lindsey that these injuries did not prevent Appellant from engaging in "outdoor activities." Appellant attempted the leg-lift test with little success, and then abruptly announced that he could not do it. Lindsey then moved on to the heel-to-toe test.

evidence to the jury because he wanted the jury to infer that, to the extent Appellant may not have performed optimally on the field sobriety tests, it was because he was tired from his afternoon of jet skiing. It would have been counterproductive to this approach, Barnett believed, to try to suggest to the jury that jet skiing was not a particularly demanding physical activity.[9] He also testified that, in his own personal experience, "it takes a lot of—I think it takes dexterity to ride a jet ski." Applicant offered no testimony to the contrary at the writ hearing to demonstrate that such testimony could have been available at his trial. Nor does the "demonstrative" still photograph he admitted at the writ hearing demonstrate that jet skiing entails no physical dexterity.[10] Appellant has not satisfied his burden to show that Barnett performed deficiently in failing to offer such evidence at trial.

### 2. Medical Record

■■ Prior to trial, Barnett had obtained a one page medical record reflecting an MRI that was conducted on October 7, 2002, two years before Appellant's arrest, showing a prior ligament sprain injury to Appellant's left ankle, "advanced post-traumatic/degenerative talocrural arthritis," and a history of a prior ankle fracture with persistent soreness.[11] Barnett failed to offer this medical record at trial. During its final argument, the State argued that the

jury should discount Appellant's claimed prior injuries for lack of any corroborating medical records. Appellant now argues that Barnett performed deficiently in failing to introduce the medical record to head off the State's argument.

At the writ hearing, Barnett was hard pressed to give a plausible explanation why he had not offered the medical record. But this was, if anything, an isolated omission, and we do not deem it "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Appellant had already told Lindsey on the arrest video that his prior injuries did not prevent him from routinely engaging in "outdoor activities," which he told Lindsey he participated in "all the time" notwithstanding his prior injuries. It is therefore unlikely that the jury would have been greatly influenced by Barnett's assertion that it was Appellant's prior injuries that prevented him from satisfactorily performing the leg-lift, or any other, field sobriety test—with or without the medical record.[12] There is not a reasonable likelihood that the jury would have acquitted Appellant had it been made aware of Appellant's medical record. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

---

9. The convicting court concluded that this was an acceptable strategic decision, echoing *Strickland*'s observation that "[t]here are countless ways to provide effective assistance in any given case." 466 U.S. at 689, 104 S.Ct. 2052.

10. The convicting court made a finding that "[t]his evidence would have been unpersuasive." We agree.

11. In the arrest video, Appellant told Lindsey that it was his *right* ankle that had been

previously injured. Appellant does not address this discrepancy.

12. Moreover, because Appellant told Lindsey on the video that it was his *right* ankle that had previously been injured, while the medical record indicated his *left* ankle, introduction of the medical record could have caused the jury to believe that Appellant was so intoxicated that he could not remember which ankle had been injured.

reasonable probability is a probability sufficient to undermine confidence in the outcome.").

## CONCLUSION

Having concluded that Appellant has failed to carry his burden to establish that he suffered ineffective assistance of counsel in his 2005 DWI trial, we reverse the judgment of the court of appeals.

Alcala, J., filed a dissenting opinion in which Richardson, J., joined.

Newell, J., did not participate.

Alcala, J., filed a dissenting opinion in which Richardson, J., joined.

I respectfully dissent from this Court's judgment that reverses the judgment of the court of appeals and denies post-conviction habeas relief to Richard Mark Bowman, appellant. I disagree with this Court's majority opinion's analysis on two bases. First, unlike the majority opinion, I would not avoid reaching the issue of laches in this case where that issue was fully litigated both in the habeas court and the court of appeals and is an issue that is important to the jurisprudence of this state. Second, because I agree with the court of appeals's ultimate conclusion that appellant received ineffective assistance of counsel at his trial, I would not reverse that court's judgment granting appellant relief on that basis.

With respect to the first of these matters, in the instant petition for discretionary review that this Court has granted, the State complains about the court of appeals's rejection of its argument that this case is barred by laches, but today this Court declines to address that issue by simply concluding that appellant's ineffective-assistance complaint should be rejected on its merits. Having accepted that ground as a basis for this Court's review of

this case, I would address the State's laches complaint, given that this is now the fourth time that an appellate court has been presented with the laches issue, and given that laches is an important issue that affects a large number of habeas cases in this state. In 2014, the court of appeals held that the State waived the defense of laches for failing to raise it as an issue in the habeas court. *Ex parte Bowman*, 444 S.W.3d 272, 279 (Tex. App.—Houston [1st Dist.] 2014). On discretionary review, this Court held that the State did not waive the laches defense by failing to raise it in the habeas court, and we remanded for the court of appeals to address that defense. *Ex parte Bowman*, 447 S.W.3d 887, 888-89 (Tex. Crim. App. 2014). On remand, the court of appeals addressed laches by holding that the State was not materially prejudiced by appellant's delay in seeking relief. *Ex parte Bowman*, 483 S.W.3d 726, 738 (Tex. App.—Houston [1st Dist.] 2016). The court of appeals explained that the State had failed to present the trial court with any evidence to establish that appellant's delay in seeking habeas relief would materially prejudice the State in retrying its case against him, and it further determined that appellant actually presented affirmative evidence that the State would not be materially prejudiced as a result of his delay in seeking habeas relief. *Id.* Three appellate court decisions have discussed the equitable doctrine of laches as it applies to this case, and this Court's granting of review in this case was primarily for the purpose of addressing laches, but today this Court decides not to address that issue. Because this is an important issue of state law that affects many habeas applications, I would not decline to address the issue of laches in this case, but I would instead address that issue, adopt the reasoning of the court of appeals in its opinion on remand, and hold that habeas

relief is not precluded by the application of the doctrine of laches in this case. *See id.*

Second, as to the merits of appellant's ineffective-assistance complaint, this Court's majority opinion holds in favor of the State by rejecting the trial court's factual finding that trial counsel did not obtain and review the arresting officer's payroll records because that finding lacks support in the record. This finding is pertinent because the court of appeals reversed the trial court's denial of habeas relief on the basis that this finding showed that trial counsel had not conducted reasonable pretrial investigation and that he performed deficiently on that basis. Because I would hold that appellant's ineffective-assistance claim is meritorious regardless of whether this factual finding is supported by the record, I disagree with this Court's denial of habeas relief based on its rejection of that factual finding. Further, although I do not fully agree with its analysis, I agree with the court of appeals's ultimate conclusion that appellant's trial counsel was ineffective, and I would uphold its judgment granting him relief on that basis.

This Court's majority opinion determines that, because trial counsel could not remember whether he had obtained the payroll records and there was no definitive evidence to show this one way or the other, the habeas court could not properly make an affirmative factual finding that counsel failed to obtain the payroll records. But it appears to me that counsel's performance was inadequate as to the payroll records whether or not he had actually obtained and reviewed them prior to trial. On the one hand, if the evidence showed that counsel had obtained and reviewed the payroll records, then he should have actually used those records more effectively to defend appellant at trial with the evidence that the arresting officer had a financial bias. On the other hand, if the

evidence showed that counsel had not obtained and reviewed the payroll records, then, as the court of appeals determined in its analysis, that would reveal that counsel's investigation was inadequate in this respect. However you slice it, whether he did or did not obtain the payroll records, counsel's performance was deficient with respect to his handling of the payroll records.

In an Article 11.072 habeas proceeding, as here, the trial judge is the sole finder of fact, and we afford almost total deference to a trial court's factual findings when they are supported by the record, especially when those findings are based upon credibility and demeanor. *State v. Guerrero*, 400 S.W.3d 576, 583 (Tex. Crim. App. 2013). This Court previously has observed that factual determinations made in an Article 11.072 habeas proceeding are to be afforded the highest level of deference by an appellate court. *See Ex parte Garcia*, 353 S.W.3d 785, 788 (Tex. Crim. App. 2011) (observing that, in context of Article 11.072 application, the court of appeals and this Court "are truly appellate courts," and, thus, as compared to an Article 11.07 habeas proceeding, there is "less leeway" to disregard trial court's factual findings). Generally, in an Article 11.072 habeas application where the resolution of the ultimate issue turns on an evaluation of credibility and demeanor, the denial of a habeas application is within the trial court's discretion and may be overturned only if the appellate court finds that the trial court abused its discretion. *Ex parte Aguilar*, 501 S.W.3d 176, 178 (Tex. App.—Houston [1st Dist.] 2016, no pet.). But, if the resolution of the ultimate question turns only on the application of legal standards, we review those determinations de novo. *Id.* ("The generally-applied abuse of discretion standard is not appropriate when the decision does not turn on the credibility or demeanor of witnesses."); *see also Ex*

*parte Mello*, 355 S.W.3d 827, 832 (Tex. App.—Fort Worth 2011, pet. ref'd) ("If the resolution of the ultimate question turns on an application of legal standards, we review the determination de novo.").

The habeas court in this case determined in its findings of fact and conclusions of law that the arresting officer was the only witness to give the opinion that appellant was intoxicated and that that testimony was "substantially" relied upon by the State to establish appellant's intoxication. The habeas court, however, also determined that counsel's choice not to more aggressively impeach the officer was reasonable, given that (1) counsel had presented the jury with some information regarding the officer's financial motive to make DWI arrests, and (2) counsel had made a reasonable decision to pursue a trial strategy that was primarily focused on undermining the dash-cam videotape depicting appellant immediately prior to his arrest. The trial court found that appellant "cannot show that but for the alleged failings of the defense counsel, the result would have been different." The latter two determinations are conclusions of law that do not turn on an evaluation of credibility and demeanor, and thus they are subject to de novo review on appeal. As I have explained above, regardless of whether counsel failed to obtain the records or obtained the records and decided not to use them, in my view, counsel's performance fell below an objective standard of reasonableness because the impeachment evidence was readily available and of such a quality that it might have substantially undermined the officer's credibility. Under those circumstances, no reasonably competent attorney would have failed to obtain and use the records. As to prejudice, given that the habeas court determined that the officer's testimony was substantially relied upon to establish appellant's intoxication, I conclude that there is a reasonable proba-

bility of a different outcome had counsel presented this evidence. Accordingly, I agree with the court of appeals's ultimate conclusion that appellant's trial counsel was ineffective either for failing to conduct an adequate investigation or for failing to present significant impeachment evidence against the officer.

I would reach both the issues in the State's petition for discretionary review, hold that this case is not barred by laches, and uphold the court of appeals's judgment granting appellant post-conviction habeas relief. I, therefore, respectfully dissent from this Court's judgment.